Louisa Middaugh *et al.*

*v.*

Charles Fox *et al.*

*Filed at Ottawa October 31, 1890.*

Laches—*asserting a trust—which had been concealed.* Where the existence of a trust was fraudulently concealed by the trustee from the heirs of the *cestui que trust* for over thirty years, a delay of six months after discovery of the trust and the fraud, before instituting a suit for the enforcement of the trust, was held not such *laches* as to bar equitable relief.

Appeal from the Circuit Court of Cook county; the Hon. Murray F. Tuley, Judge, presiding.

At the hearing of this case in the Circuit Court the following opinion was delivered by the Judge before whom the hearing was had, in which the evidence and the findings of the court thereon are sufficiently stated:

Tuley, J.: "The main facts appearing in evidence in this case I find are as follows: That William H. Price, for a number of years prior to the beginning of the year 1848, had been engaged in the planing-mill business in the city of Chicago, and was in partnership with one Parsons in September, 1848, when his brother-in-law, George W. Noble, a carpenter, came to Chicago, and went to work for the firm by the day. The mill had been burned in the latter part of 1847 or beginning of 1848, and the firm suffered considerable loss. Temporary structures having been erected, the business was carried on mainly under the superintendence of Parsons for about a year, when the firm dissolved. Parsons says he took out about $7000,—just about what he had put into the business. Price's attention was given to the erection of a large brick mill adjoining the site of the old one, and he became, by reason of such building, somewhat embarrassed. He made an arrangement

with one Charles Walker, (2d August, 1848,) by which, in consideration of $1500 loaned him for three years, which he secured by deed of trust on parts of lots 4 and 5, block 46, original town of Chicago, on which the mill was situated, and in lieu of interest, he agreed that Walker should have one-half of the profits of the mill until the $1500 should be paid, the mill and machinery to be completed by Price. Upon the 21st of January, 1849, an arbitration award was made as to the breach of the agreement between Price and Walker, the latter having prior to that date filed a bill, on the chancery side of the circuit court of Cook county, against W. H. Price, George W. Noble and Norman Price, a brother of William H., alleging that the two latter were in the possession or control of the mill property, and praying to have the agreement referred to specially enforced. The award was filed in the county court on February 2, 1849. The records having been burned in the great fire of 1871, the only evidence of the contents of the pleadings in that case is that of Scammon, one of the solicitors in the case, who testifies as to the contents of the bill as above stated. It appears that Price, in August, 1848, was in possession of certain real estate, lots 4 and 5, and east one-fourth of 1, in said block 46, claiming an ownership or interest therein, and of the new brick mill standing upon part of lots 4 and 5. The south thirty-five feet of lot 4, upon which thirty-five feet of the mill (which was 40x80 feet) stood, was owned by Price, under a contract with one Berg. On December 21, 1848, Price paid the balance (not then due) of the purchase money, and at Price's request Berg made a deed thereof to George W. Noble, which was filed for record the same day. On January 6, 1849, Price, it appears, made a deed of the east one-fourth of lot 1 to Noble, for the expressed consideration of $2000, subject, however, to a mortgage of $1000, which deed does not appear to have been recorded until December, 1850.

"Except so far as the foregoing facts may tend to show Noble in the possession of the mill, there is nothing to show

that Noble ever was in the actual possession or control until after the making of the award, which bears date, as stated, the 21st of January, 1849. As to who was in actual possession of the mill and running the same up to the time Price left for California, the evidence is conflicting. It is one of the contested points in the case.

"Some twelve or fifteen witnesses, friends and acquaintances of Price, several of whom were carpenters and builders, and did business with the mill, testified that Price was in possession and control of the mill up to the time he left for California, the latter part of October, 1849. On the side of the defense, one Kenedy, who measured the lumber and planed for Walker, under the award, from some time in May, 1849, until December, 1849, about which time the planing thereof, under the award, was finished, says that he did all the business with Noble. Schwering, a German, who worked at the mill, swears he commenced in 1848 and worked until May, 1849, for Price, and then commenced working for Noble, and thereafter continued to work for Noble. Noble first paid him in June, 1849. Anderson, another workman, commenced about the 2d of August, 1849; says Price hired him for three months for Noble, and Noble paid him. Johnson testifies that he did business with Noble early in 1849. The books of one Charles Cleaver show that September, 1849, to May, 1850, Noble purchased machine oil, in his own name, to the amount of over $500. There are book entries offered in evidence, among which are Gates' books, showing entries commencing in March, 1849, and running through the year, against Noble, for machinery, repairs, etc.

"Noble paid assessments and taxes on lots 4 and 5, and east one-fourth of lot 1, in August and November,—that is to say, the receipts therefor run to him. He also paid canal interest due on the sale of lot 5, to Price, in October, 1849, the receipt reading: 'Received of W. H. Price, by the hands of George W. Noble.'

"The award, to which reference has been made, provides that in satisfaction of the agreement Walker should have the right to require of said Price the planing of thirty thousand feet of lumber for forty weeks, upon paying to said Price or George W. Noble 'two dollars per M. at the end of each week;' if planing not done, Walker to require of Price $50 per week, or at that rate, for any deficiency; certain payments of cash, $250 first of March, like sums on first of April and May, to be paid Walker for damages on the claims of Walker against Price for non-fulfillment of contract. Upon performance of award 'by Price or said Noble,' Walker should release 'to said Noble' all claims on premises and machinery described in the bill of complaint and in the trust deed, and all claims under the agreement and award therein. It also provided that Price should give bond, with security, within thirty days, in the penalty of $1000, to pay all debts contracted by Price since the first of June, 1848, on the joint account of Price and Walker, if any, and on the purchase of lumber, and to save harmless and indemnify said Walker. Also, fourth, 'said Noble shall have and take the full and exclusive possession of said premises and machinery, and shall retain the exclusive possession of the same for the security and protection of all parties, subject to the control of the court in case of malfeasance or neglect of duty, until said Walker shall receive the amounts above awarded him, and until the provisions of this award shall be fulfilled; and he shall receive the earnings of said premises and machinery and business until the expiration of such time, and have the exclusive use and control thereof, subject to the control of said court.' The expenses of the award were to be borne by Price and Walker, and the costs of the suit by the defendants, W. H. Price, G. W. Noble and Norman Price, who were to have all the earnings and bear the expenses since the filing of the bill in the suit. A release was made January 21, 1850, which recites that all the conditions of the award have been performed and complied with 'by said W. H. Price, or by

said George W. Noble in his place and stead, and by said George W. Noble.'

"The evidence shows that on the . . . . . day of February, 1849, Noble made a trust deed, to secure $1500, on the east one-fourth of 1 and all of lot 5; that he borrowed from Parsons, February 26, and on March 1, and in April and May, 1849, sums from $100 to $250, and in June of same year, $1000 of Smith and Scammon, and thereafter, in '49 and '50, some other smaller amounts from Scammon. Price, it appears, had contemplated going to California for a year before he finally left, but was prevented because of· his business troubles. He left the last of October or first of November, 1849, for California, by way of the isthmus, and except one letter from him, written *en route* from New Orleans, was never directly heard from thereafter. His family was left in charge of Noble, who provided for their wants for some months thereafter,—probably for a year,—and then ceased so to do. The wife of Price took in sewing, and supported her two children, (Olivia, aged twelve, and Henry W., aged ten years,) in Chicago, until May, 1852, when her father and brother came to Chicago and took the family to their·home in New York. The family shortly afterwards went to Buffalo, New York. The daughter married there in 1858, and died in 1860, in childbirth, leaving one son, the complainant Charles H. Fox. The mother died in 1867, in New York State. In 1859, the son, the complainant Henry W. Price, came west, remained in Chicago a few months, and then settled at Rockford, Illinois, where he has since lived.

"The complainant introduced the evidence of several persons who knew both Price and Noble, who testify to admissions made by Noble as to the character in which he held the property of Price after Price left for California.

"Mr. Castle swears that he and Noble were intimate, and were brothers in the masonic order; that he left for California in November, 1849, and returned to Chicago December 1, 1850,

and two or three days after his return he saw Noble, and told him that at Panama he had seen a list of persons who had died on the isthmus, and that among them was the name of William H. Price; that Noble appeared to feel badly over Price's death, and told him that Price had left him in charge of his property, and thinks he told him he was to get $1000 a year salary. Noble also said that he was going to take care of Price's family. This witness also swears that the mill was known as Price's, and that Noble did business for two or three years after Price left, in Price's name.

"Ellithorpe swears that he returned from California March, 1851; spoke to Noble of Price's death; that Noble said that Price was not dead, and that he was taking care of Price's property for him. This witness also said he bought a good deal of lumber (he was a carriage maker) of Noble for two or three years following, and never knew that Noble claimed any ownership of the mill property.

"John Plane swears Noble showed him the mill and other property, and said it was left in his hands by his brother-in-law, who had gone to California, to take charge of while he was away.

"Isabella Kelsey swears that she was intimate with Noble and his family, and that shortly after Price left, Noble told her that he was not going to keep boarders any longer; was getting a larger salary; that his brother-in-law, Price, had gone to California, and left him in charge of his business.

"E. H. Cummings swears that in July, 1849, when he and Price and one Prettyplace were talking about going to California, and how much each was going to take in money, Noble was present, and Price said that he was only going to take $350,—which was the exact amount of the receipt hereinafter mentioned; that he was going to leave his business with Noble and his brother Norman, and that, although he owed some debts, the business was in a pretty good condition, and if he wanted any more money he could draw on that.

"Julia Hopkyns, the former wife of Norman, testifies that Price was in charge of the mill up to near the time he left for California; that just before he left he made two written agreements, one with Norman and one with Noble, by which Norman was to continue in charge of the sash-making on the second floor, and to have his salary raised to $50 a month, and Noble was to take the general charge of the mill business, which was to be carried on as theretofore, and that Noble's salary was to be raised to $83 a month; that when Noble and W. H. Price and her husband were all together, W. H. Price said he had his business well settled up, so that they (Norman and Noble) would have no trouble at all; that they should take the business and hold it in trust until he returned, which would be in about a year, if not sooner; that Price left his family in charge of Noble, to be supported as they had been accustomed to; that Noble did support them for about a year, and that about a year after Price left, Noble induced Mrs. Price to let him have some papers which her husband had left with her, on his promise to return them, and then refused to do so; that her husband, on leaving Chicago, gave his contract up to Noble, but made Noble promise to give it up to his brother, William H., if he ever returned; that after obtaining the papers, Noble said that he had 'the dead wood' on Bill Price, and intended to keep it; that Norman and herself remained here about three years after W. H. Price left, and that Noble never claimed ownership, to her knowledge.

"Cummings swears that he and Noble had a quarrel about the papers; that Mrs. Price applied to him to get the papers from Noble; that Noble admitted having them, said he would keep them, and threatened if Mrs. Price made any trouble he would show up her husband; that he (Noble) stated that Price had gone off with a woman, and was in Texas; at another time, that he was with a woman in California; that although he (Cummings) recommended Mrs. Price to go to a lawyer, she

dropped the matter after Noble's threats were made; that Mrs. Price was a very sensitive, proud woman.

"The evidence shows that a judgment on a mechanic's lien for $304 was obtained May 24, 1849, in the suit of *Wheeler* v. *Price.*

"On September 21, 1849, on a special execution, lot 4 was sold to Wheeler, and April 10, 1850, Noble paid the redemption money, but on the next day, April 11, 1850, took a quitclaim deed to himself from Wheeler, which deed was recorded December 20, 1850.

"On a mechanic's lien at the suit of one Warrington, a judgment for $186.25 was entered against Price and Noble, May 15, 1850, and the south thirty-five feet of 4 sold under a special execution to one Lay, July 15, 1850. Noble paid Lay $50, and took a receipt containing an agreement to assign the certificate to himself on payment of the balance. September 21, 1850, the balance was paid and certificate assigned. No deed was ever issued on the certificate. Lot 5, upon part of which stood the new mill, was held upon a canal certificate issued originally to Price. It appears that James H. Rees paid one interest payment, and that on October 27, 1849, and on October 6, 1850, a receipt was given to Noble, which read, 'Received of W. H. Price, by the hands of George W. Noble,' interest due, etc.; and October 6, 1851, and thereafter, all payments were receipted for to George W. Noble, 'assignee of W. H. Price.' On the 19th of January, 1854, Noble obtained the final certificate of payment as assignee of Price, and on January 25, 1854, a patent issued to him.

"The original certificate, which is always surrendered to the canal officials when final certificate of payment is made, can not be found, and there is no express proof as to what assignments it contained. There are some circumstances which lead to suspicion as to the assignment to Noble. There is no proof of any assignment to Noble of the canal certificate for lot 5, and A. J. Galloway, who was in the canal office, testifies that

he recollects being asked to issue a receipt to some one as assignee of Price, but refused to do so because there was no proof of such assignment. The receipts of 1849 and 1850, which read to Price, by the hands of George W. Noble, are signed by Galloway.

"The defense introduced in evidence a receipt, purporting to be signed by W. H. Price, dated October 20, 1849, which acknowledged the receipt of $350, 'in settlement in full to this date,' the body of the receipt being in Noble's handwriting. The genuineness of this signature of Price is challenged by the defense. The receipt appears to have been written on a page, or part of a page, of an account book. The evidence touching this receipt leaves me in grave doubt as to the genuineness, when it is considered in connection with other evidence in the case.

"The evidence as to whether Price was in good credit in the year 1849 is conflicting, but there is no doubt but that he was, prior to the fall of 1849, financially embarrassed; but the amount of his debts, so far as the same appear in evidence, was very small, when compared with the amount of property of which he was possessed. The evidence shows Price to have been a good business man, somewhat broken in health by over-work, and that his trip to California was partly undertaken because thereof. Noble appears to have been a very keen, active, energetic business man, and a great money getter. He was also a very reticent man. He married Price's sister in 1845, and worked as a journeyman carpenter up to his arrival in Chicago, in September, 1848; that he commenced work for Price, or Price & Parsons, at day wages. Noble's wife received less than $400 from her father's estate just before Noble and herself came to Chicago, and had no other means. The evidence quite conclusively shows that in 1848 and beginning of 1849 Noble was impecunious, and financially unable to purchase the property transferred to him by Price.

"Noble died in the latter part of 1886, and no trace of the books kept at the mill in 1848, 1849, 1850, 1851 or 1852, or papers connected with the business, can be found. The only sign which appears to have been on the mill was that of Parsons & Price. Whether it remained there after Price left does not clearly appear. An old city directory, dated October, 1849 and 1850, gives the name of George W. Noble's planing mill. Neither W. H. Price nor his wife appears. It appears that the brick mill was destroyed by fire in 1858, and that neither the south thirty-five feet of lot 4 nor lot 5 has ever been built upon since that time, although situated in the dense portion of the city, and favorably located for improvement.

"Mrs. Middaugh, the former wife of Noble, and who afterwards married his nephew, whose mother was one of the heirs-at-law of George W. Noble, was sworn, and testified that Noble, three or four months after his arrival, bought out Price; that he had $800, and she gave him $400. She also testifies to a conversation when Price, Noble, herself and Price's wife were present, in which Price denied telling his wife that the property was to revert back to him in two years, stating that she misunderstood him,—that the sale was absolute. I, however, have rejected this testimony as incompetent, as also do I consider incompetent the letters written by Noble,—one to his brother, in 1849, and one to Mr. and Mrs. Middaugh, in which he speaks of the mill as his own, and that he had bought 'a man out.' One Goodsell, a relative, testifies, that Noble told him, after 1850, (just when does not appear,) that Price first made papers to him in trust; that when they were shown to a lawyer he said they would not hold, and thereupon new *bona fide* papers were made out, and the property was his.

This is substantially all the evidence in this peculiar case. What questions present themselves for our determination, and what conclusions does the competent evidence in the case lead us to?

"It is evident that there was either a sale to Noble or that the transfer to him was upon some kind of trust. There is no evidence showing a sale of the personal property at the mill, machinery, lumber, etc.; no bill of sale or any parol evidence or writing to show Noble's ownership of the personal property. That there may have been a transfer of the actual possession of the mill, in whole or in part, prior to the date of the award, (January, 1849,) appears to be probable, from the evidence; but the nature of such transfer does not clearly appear. That on December 21, 1848, Berg made a deed to Noble, at Price's request, of the south thirty-five feet of lot 4, on which the mill was almost wholly situated, would seem to prove that the transfer of the possession of the mill to Noble was voluntary and without consideration. The evidence, in my opinion, shows conclusively that prior to the award Noble did not have the money with which to purchase the mill property and the lots upon which it was situated. It was certainly, from the evidence, worth more than $5000 above incumbrances. It will be noticed that Noble did not commence to borrow money until some time after the arbitration award.

"If there was no sale to Noble of the mill property, real and personal, at the date of Berg's making the deed of the south thirty-five feet of lot 4 to Noble, at Price's request, is there any evidence of a subsequent sale? The transfer to Noble being without consideration, and voluntary, was made for some purpose, but what purpose does not clearly appear. It was not a gift. It may have been in pursuance of Price's plan to go to California. The date when the award was made, appears; but the date when the arbitration was had and the conclusions of the arbitrators (which were afterwards put in writing) were arrived at, nowhere appears in the evidence. Some time may have intervened before the award was ready for delivery, and the transfers to Noble may have been in pursuance of such conclusions, and in anticipation of their being reduced to writing. It clearly appears, from the evidence of a large num-

ber of witnesses, that Price exercised acts of ownership and control up to the time he left for California, and there is also some evidence and book entries referred to, going to show that Noble was carrying on the mill business and controlling the real estate from about February, 1849. Upon the theory that W. H. Price was the actual owner, and that Noble had some trust relation to the mill property and business, this apparently conflicting testimony of the numerous witnesses of complainant that Price was carrying on the mill business, and of the defendant's evidence tending to show that Noble carried on the business prior to Price leaving, can be reconciled. Upon any other theory the evidence is irreconcilable.

"*Second*—The evidence showing that there was a trust of some character connected with the transfer to Noble of the mill property, was it a transfer in fraud of creditors? Price's debts were very small in comparison with his assets. Walker, his principal creditor, ($1500,) was secured by a trust deed on an undivided half of the mill property. Respecting the evidence of Mrs. Middaugh, formerly Noble's wife, I find no testimony indicating a fraudulent transfer. If Noble, after hearing of Price's death or probable death, did, in conversation with Goodsell, tell him, in substance, that such an attempted transfer was made, his declaration as to such fraud, made to a third party, would be no evidence against Price or his heirs, and would be consistent with a fraudulent after-thought of converting the property to his own use. A trustee can not, by his simple declaration of a fraudulent transfer to himself, convert a *bona fide* trust or conveyance into a fraudulent one.

"*Third*—What, then, was the trust under which Noble held the property, and what property did it cover? If Noble and Norman did, prior to the award made in January, 1849, have any actual possession or control of the mill property, it was under some undisclosed agreement and understanding, but it was in trust for Price, whatever may have been the nature of or the conditions of the transfer to Noble and Norman. I am

of the opinion that the trust was, by consent of all parties in interest, changed by the arbitration into an agreement that Noble should hold the mill property described in the award, in trust for all parties, to secure the performance of the Walker arbitration award, and thereafter in trust for William H. Price. The arbitration award, in the light of the then surrounding circumstances, to my mind, clearly shows that all the parties connected with that award considered W. H. Price the beneficial owner of the mill property and machinery.

"The provision of the award above quoted, that Noble should have, take and retain exclusive possession of the mill and machinery, 'for the security and protection of all parties,' until the award should be fully performed, fixes the trust character of that possession and control which he exercised over the property after the award and until W. H. Price left for California. That trust relation had been discharged, as to Walker, by the planing of the lumber, some of which was done after Price left for California, and the making of certain money payments by Noble. The provision of the award that he was also to receive the earnings of said premises and machinery and business until 'the performance of the award, and have exclusive use and control thereof,' may reasonably account for his appearing to run the mill, for his borrowing money of Parsons and others, to run the business, and the book entries against him for oil, repairs, etc. The receipt of $350, dated October 20, 1849, if genuine, may also be referred to a settlement of accounts between Price and Noble as to said earnings of the mill and machinery.

"Was the trust imposed by the arbitration award ever discharged or modified? A. I am of the opinion that after the award, and before Price left for California, an agreement in writing was executed between Price and Noble, by which Noble, in consideration of an advance of salary to $1000 per year, was to complete the Walker award, and carry on the business of the mill as Price's agent, until Price's return from Califor-

nia, which the parties then supposed would be in one year or less,—that this writing certainly covered the same property (64x150 feet, parts of lots 4 and 5,) described in the award.

"It is a fair inference,—it may be said to be a necessary one,—from the evidence, that Price assigned or caused to be assigned to Noble the canal certificate as to lot 5 upon the same trust upon which he caused the south thirty-five feet of 4 to be conveyed to him. As the mill stood partly on lot 4 and part on lot 5, it is a fair deduction, from the evidence, that the written agreement between Price and Noble included all of lot 5, as well as the south thirty-five feet of lot 4. It is a fact of some significance that these two pieces of property have remained unbuilt upon, although very central, since the mill was last destroyed by fire, in 1858.

"It may be that the agreement between Price and Noble was acted upon as a parol agreement for some months prior to Price's leaving, but that it was put in writing at or about the time of Price's going away I am satisfied from the evidence. The important question is the execution of such an agreement, not the date when it was executed. That there was such an agreement as sworn to by Mrs. Hopkyns, (*nee* Mrs. Norman Price,) is consistent with Cummings' testimony as to Price's declaration, in Noble's presence, that he intended making such an arrangement. It is also consistent with the evidence given by John Plane, Isabella Kelsey, E. H. Castle and Ellithorpe, that he, (Noble,) after Price left for California, declared to each of them that he held Price's property in trust for Price, to take charge of during Price's absence. It is consistent with nearly all the evidence in the case, the great mass of which is utterly inconsistent with the theory of any sale to Noble by Price. While there is evidence tending to show that Price did transfer all his property, real and personal, in trust to Noble, it is, in my opinion, insufficient to charge any property with the trust except the mill and *its* contents and the real estate upon which it was situated,—*i. e.*, lot 5, and the south

thirty-five feet of lot 4. I am not satisfied with the evidence of a trust as to any other property.

"This case is one of considerable difficulty, because Price and Noble are both dead, the facts occurred forty years ago, and many witnesses who might have testified have passed away. The records of the courts and of the recorder were burned in the great fire of 1871. Many of the witnesses were very old, with impaired memories; but considering the time that has elapsed and the necessarily confidential nature of the trust, the disappearance of Price, the infancy of the children, their absence from Chicago, the poverty of the family, and other circumstances in evidence, the case is proven by as much positive testimony as could be expected under the circumstances. The law requires clear and convincing evidence of a trust as against the terms of the deed, but it only requires the judgment to be satisfied by as good proof as the nature of the case will admit.

"As to defense of the lapse of time,—something near forty years,—it is sufficient to say that there is no statute of limitations which will run against a trust. The equitable defense of *laches,* which is somewhat analogous to that of the Statute of Limitations, is founded upon the doctrine of acquiescence in the wrongful conduct of another. It is called a *quasi* estoppel. This acquiescence, in order to estop a party, must be with knowledge of the wrongful acts themselves, must be voluntary, not the result of accident, and must last for an unreasonable length of time. No lapse of time,—no delay in bringing a suit,—will defeat the remedy, provided the injured party was, during all the interval, ignorant of the fraud. The duty to commence proceedings can only arise upon the discovery of the fraud. It appears in this case that the first intimation to complainant as to Noble's having obtained this property in trust was after Noble's death. He died in 1886, and this suit was commenced in 1887. There was no *laches,* no delay, after knowledge.

"The decree should require an accounting of the profits of the mill during the time that Noble ran the same as a planing-mill; also an accounting for the rents received by Noble until the mill burned down, and of the insurance money, if any such was received. In default of the master being able to determine the profits received from the mill by Noble during the time he ran it, he will ascertain the then going rental value of the said mill and charge the trust therewith. And if he can neither ascertain such profits or then going rental value, he will ascertain the then market value of said mill property, including said south thirty-five feet of lot 4 and said lot 5, and charge the trust with a rental value of six per cent per annum on such market value. He will pursue a like course as to the rents received from the mill by Noble from others, if he can not ascertain what rents he actually received.

"The trust will be charged with all rents received for the said thirty-five feet of lot 4, and for lot 5, or any part of such real estate, after the destruction of the mill by fire, and for the time that none was received the master will charge the trust with what rents might have been received.

"The master will be directed to credit the trust, upon such accounting, with all expenses and charges usually allowed to a trustee by law and the practice of courts of equity, providing, however, that no compensation will be allowed for the services of the trustee after the first year, and for that year he will allow $1000 as such compensation or salary.

"The accounting will treat all matters, so far as the current expenses and profits of the mill are concerned, as settled up to the 20th of October, 1849, not including therein any moneys borrowed by Noble for which said south thirty-five feet of lot 4 and of said lot 5, or any part of either lot, was given or pledged, in whole or in part, as security.

"The decree will contain the usual provision of leave to apply for further directions herein, and as to such accounting, and reserve all questions of costs to final decree to be made herein."

Mr. W. C. GOUDY, and Mr. E. B. McCAGG, for the appellants.

Mr. J. C. CARVER, Mr. HENRY C. NOYES, and Mr. W. LATHROP, for the appellees.

Mr. JUSTICE BAILEY delivered the opinion of the Court:

This was a bill in chancery, brought by Charles H. Fox, a grandson and one of the heirs at law of William H. Price, deceased, against Henry W. Price, the son and only other heir at law of said decedent, and Louisa Middaugh and others, the heirs at law of George W. Noble, deceased, to establish and enforce a trust alleged to have been created in the year 1849, between said William H. Price and said Noble. The original bill was filed June 29, 1886, and a demurrer thereto having been sustained, an amended bill was filed November 30, 1886. The defendants appeared and answered, and Henry W. Price filed a cross-bill, setting up substantially the same matters alleged in the amended bill, and praying, in his own behalf, the same relief. The cross-bill was answered, and the cause being heard on pleadings and proofs, a decree was rendered in accordance with the prayer of the amended and cross-bills, and the defendants, the heirs of said Noble, bring the record to this court by appeal.

The case made by the bill and cross-bill, when relieved of much of its verbiage, is substantially as follows: In the year 1836, William H. Price became a resident of Chicago, and succeeded in accumulating a considerable amount of real and personal property, so that in 1847, he was in possession of certain lots of land in Chicago to which he had an equitable title, and on which were situated several dwelling-houses and a planing-mill. Sometime during the year 1847, said dwelling houses, planing-mill and a large amount of machinery and lumber were totally destroyed by fire. In the spring of 1848, he erected on lots four and five, in block forty-six, in the Original Town of Chicago, those being the lots which are now

the principal subject of controversy, a large brick four-story building, worth not less than $20,000, and furnished it with the necessary machinery, and during that year and up to October in the year following, carried on successfully and profitably in said building the planing-mill business, and the manufacture of sash, doors and blinds. Out of the profits of said business he was enabled to pay and discharge most of the indebtedness arising from the construction of said building, the procurement of said machinery, the purchase of lumber and other expenses incident to carrying on said business, so that in October, 1849, his indebtedness amounted to comparatively a small sum of money, and might have been fully paid and satisfied out of the profits of said business for the year then next ensuing.

Sometime in 1848, Price determined to go to California, where gold had then recently been discovered, with the intention of being absent about one year. In anticipation of his absence on said trip, he sought to leave his property matters and business in such situation, that said business might be carried on, his remaining indebtedness provided for, and his property and the good will of said business preserved, so that on his return he might receive the same back with all accruing profits.

Noble, who was Price's brother-in-law, had come on from the east the year previous, and since his arrival in Chicago had been employed by Price in some capacity in his business. Noble was poor and substantially without means, but was a person in whom Price reposed very great confidence, and who had become familiar with Price's property and business. Price, accordingly, entered into some arrangement or agreement with Noble, the precise terms of which the complainants are unable to give, but which was in substance and effect that Price should turn over to Noble his said property and business, in trust, to hold, manage and control said property and carry on said business, as Price's trustee, during his absence, and on his

return, to restore the same to him, and render to him an account of the use, increase and profits thereof. In pursuance of this arrangement, Price, sometime before his departure for California, transferred to Noble the equitable title he held to various parcels of real estate in Chicago, and among them to the south thirty-five feet of said lot four and said lot five, his title as to those lots being that of a vendee under certain executory contracts of purchase, the purchase money having then been already paid by Price, or being subsequently paid by Noble out of means put into his hands for that purpose by Price, and the title under said contracts of purchase being afterwards taken by Noble in his own name as trustee for Price. Price's departure for California was delayed until some time in October, 1849, and up to that time he remained in possession, control and management of said property and business. Upon his departure Noble at once entered into possession of it as trustee for Price, under said arrangement, and continued thereafter to carry on said business.

Price, after he left, was heard from once while crossing the isthmus, since which he has never been heard from, the supposition being that he died either there or somewhere else on the way. Soon afterward Noble conceived the plan of privately and clandestinely converting said property and business to his own use, and of claiming them as his own, and of secretly and quietly suppressing and destroying all evidence of the manner in which he had received and was holding them, and of creating color of title in himself to the same. In furtherance of said plan he obtained from Price's wife the books and papers relating to Price's business affairs in her possession, pretending that he needed them in carrying on the business, and refused afterwards to return them. He also sought to conceal not only his acts and doings under said trust but the trust itself, and to propagate the belief that he had bought out Price and was the owner of said property in his own right. Among other things, he suffered said lots four and five, as well as the

other real estate derived from Price, to be sold under execution on judgments against Price for certain small amounts, when he had in his hands as trustee sufficient funds to satisfy said judgments, or to redeem said lots from such sales, and instead of making such redemption, he allowed the title under such sales to be perfected in the purchaser, and then bought in such title, using the trust funds for that purpose, and took conveyances to himself. From the business and property placed in his hands, he also paid off all liens, indebtedness and claims against Price and perfected title in himself, and bought other real estate and accumulated a large personal property, all of which came from said trust fund and property, and was a part of the income and increase thereof. Said real estate largely increased in value, and said Noble, at his death, which occurred on or about December 15, 1885, left in bank about $80,000, which is now in the hands of his administrators, and is covered by said trust. At the time of his death he still held the title to said lots four and five, and to the other parcels of real estate above mentioned, without having ever accounted with said Price or his legal representatives in the matter of his said trust, and without disclosing said trust or his acts and doings under and by virtue thereof.

The family left by Price at the time of his departure consisted of his wife, who has since died, and two children, a son and a daughter, the oldest of whom was not more than thirteen years of age. The son was Henry W. Price, the complainant in the cross-bill, and the daughter was afterwards married to Joseph H. Fox, and died in 1860, at the time of the birth of the complainant in the original bill, leaving him her only child and heir at law.

Price left with his family sufficient money to support them for about six months, and arranged with Noble to supply their wants when that was gone. Noble, at the time he got said books and papers from Mrs. Price, stated to her that when she was in need of money he would furnish it. This he neglected to

do, and therefore when the money left by Price was gone, the family became very poor, and were without friends or others interested in them in Chicago. Mrs. Price accordingly supported her family by taking in sewing until sometime in the year 1850, and then all hopes of hearing from her husband having died out, she removed with her family to the State of New York where her father resided and where she had lived before coming to Chicago. Charles H. Fox was born in the State of New York, May 15, 1860, and never knew or heard, until February, 1886, of said trust or property, or of the acts and doings of Noble under said agreement, and he alleges on information and belief that his mother had no knowledge of said trust or how or in what manner Noble became possessed of the property now in controversy. Henry W. Price also alleges that he did not know of his rights to said property or the circumstances under which Noble claimed to hold it, and that it is only since Noble's death that he learned the facts in relation thereto and the witnesses by whom he could prove the allegations of his cross-bill.

The amended bill prays for an accounting, and that the rights and interests of the complainant in said trust property be ascertained and settled, and the title to an undivided one-half of said real estate be decreed to him, and that a conveyance to him of such undivided one-half be ordered, and that said moneys in the hands of said administrators be declared to be affected by said trust, and that such sums as should be found due to the complainant be decreed to him, and a general prayer for relief. The complainant in the cross-bill prays the same relief in his own behalf.

The heirs of Noble, two of whom are also the administrators of his estate, by their answer, deny the equities of the amended bill and cross-bill, and especially deny that any trust relation existed or was formed between Price and Noble, or that Noble became or was possessed of the property described in the bill, or of any property, as trustee for Price; but allege, in sub-

stance, that Price, at and before his departure for California, was largely in debt, and had various claims against him which he could not pay, and was practically bankrupt and without any estate or property whatever, and that Noble acquired or held the title to no property to the detriment of Price or his heirs at law, or otherwise than as his own, paid for with his own money gained by him by his own business, skill and application, and that he never improperly concealed any fact in relation thereto from any person whatsoever. The answers also charge the complainants with unreasonable delay and with laches in the assertion and prosecution of their claims.

Both bills and answers set forth a considerable variety of subordinate or evidentiary facts corroborative of the principal facts alleged, but we are of the opinion that the foregoing is a sufficient statement of the issues presented by the pleadings and submitted to the court at the hearing.

The court, by its decree, found that Price, in 1847, purchased the south thirty-five feet of said lot four of Joseph Berg, and paid him the purchase money therefor, and took a conveyance thereof in the name of said Noble; that he acquired title to said lot five by purchase at a sale by the Trustees of the Illinois and Michigan Canal in 1843, and paid the full price therefor, with the exception of about $300, and that in October, 1849, reposing trust and confidence in said Noble, he deposited the certificate of purchase of said lot with Noble, in trust for himself, at the same time furnishing the means with which to pay the residue of the purchase money; that prior to the date last mentioned, Price had erected on said lots a three-story brick planing-mill forty feet front and eighty feet deep, and was the owner of a large amount of machinery contained therein and used in the sash, door and planing business, and had been carrying on a large and profitable business on said premises; that in 1848, Noble, who was a brother-in-law of Price, came from the east and began to work for the firm of which Price was a member and afterward for Price alone, at

day wages; that Noble was then poor and without means or property, but was not only a relative but an intimate friend of Price, and one in whom he reposed confidence.

The decree further finds that for about a year prior to October, 1849, Price had planned going to California, in part for his health, but was delayed by his business matters, and remained in Chicago attending to said planing business and arranging for leaving his business affairs with Noble, up to the date last mentioned; that at the time of his departure he was the owner of said property and business, and that he placed the same in the hands of Noble to be held by Noble in trust for him; that he left said business in Noble's hands for the contemplated period of one year, agreeing to pay him $1000 for the year's services; that he entered into a contract with Noble in writing which stipulated and provided that said business and the title acquired by Noble should remain in Noble for about one year, in trust for Price, to be transferred to him on his return from California; that said written agreement provided that Noble should have charge of said business, except on the upper floor of the building where Price's brother Norman was carrying on the sash and blind business as Price's agent, it being provided that said Norman should have charge of the business and machinery on that floor, and that Noble should have the charge, custody and management of the residue of the property and business; that prior to his departure Price directed Noble to pay to Price's wife a sufficient sum out of the profits of the business to support her and her children during his absence.

The decree further finds that Price left for California on the 25th day of October, 1849, and died within thirty days thereafter; that Noble having soon afterward learned of his death, conceived the scheme of defrauding Price's widow and children out of said property and business; that he suppressed the news he had received and led Mrs. Price to believe that her husband was alive and had deserted her, making such

representations for the purpose of intimidating her and preventing her asserting her rights to said property; that in furtherance of said scheme, he obtained from her title and other papers relating to said property and business, upon the false representation that they were necessary for him to have in conducting said business, but in reality for the purpose of concealing them and suppressing all evidence of the rights of Mrs. Price and her children, and that he ever afterwards refused to return said papers; that for about one year after Price left, Noble, in compliance with Price's directions in that behalf, supported Mrs. Price and her children out of the income of said business, but at the end of that period he refused to furnish her further support, and thereby reduced her and her children to such poverty that they had to do hard work to support themselves in the cheapest possible manner; that Mrs. Price was a timid and sensitive woman, and that Noble threatened, if she made trouble, to expose the disgraceful character of her husband, showing that he had eloped with another woman and thereby disgrace her and her children, and that these false representations and the cruel manner in which he treated her disheartened and silenced her, and she being thus left poor and without means, her father and brother soon thereafter took her and her children to the State of New York where she continued to reside, without returning again to Chicago to live, until the year 1867, when she died; that Noble fraudulently obtained possession of the machinery left with Norman Price and converted it to his own use; that falsely representing that he was the owner of lot five, he obtained a certificate that he was entitled to a patent for said lot as assignee of Price, and thereupon received a patent to himself therefor; that the business thus left in Noble's hands was very lucrative, and produced for him a large profit for several years; that Price left him surviving as his heirs at law, his son Henry W. Price, the complainant in the cross-bill, who was then about ten years old, and his daughter, then about twelve years

old; that about 1858 said daughter was married to Joseph
H. Fox, and died in childbirth about May 15, 1860, leaving
her surviving Charles H. Fox, the complainant, her infant
child and only heir at law.

The decree further finds that said Noble died about Decem-
ber 15, 1885, leaving the defendants his only heirs at law and
the only persons interested in his estate, and that two of said
defendants have been duly appointed and qualified as admin-
istrators of his estate; that at the time of his death he was in
possession of said south thirty-five feet of said lot four and of
said lot five, and that said lots at that time were unincumbered
and unimproved, and that he was also in possession of a large
amount of other real estate, and that he left personal estate of
great value, which passed into the hands of his administrators;
that at the time of his death he held said part of lot four and
said lot five in trust for the heirs of said Price; that he at all
times concealed said trust from said heirs, and never disclosed
the same or the facts or circumstances thereof, or in any man-
ner accounted or offered to account to them concerning said
business or property, or to re-convey to them said trust prop-
erty; that neither the widow nor any of the heirs of Price have
ever resided in Chicago since said widow and infant children
were taken to the State of New York as above stated and that
they had no knowledge of said trust, and that the first knowl-
edge thereof which came to the complainants was after the
death of said Noble; that it was the duty of said Noble to dis-
close said trust to them and to account to them of and con-
cerning said trust property, and to convey said trust property
to them, and to fulfill his trust, but that he did not do so, but
fraudulently concealed the same for the purpose of converting
the same and the profits thereof to his own use.

It was thereupon ordered and decreed that the complainant
in the amended bill and the complainant in the cross-bill are
each entitled to the undivided one-half of the south thirty-five
feet of said lot four and said lot five, and to have the same

conveyed to them by the heirs of Noble, clear of all incumbrances, the court reserving the right, by further and final order, to direct such conveyance and to make such further order in the premises as may be necessary to carry out said decree and vest said complainants with the legal title to said premises and to put them in possession thereof. It was further decreed that the complainants are entitled to an accounting of and concerning said trust property and business, and the profits thereof, if any, and the cause was referred to the master to take further testimony and make such accounting and report his findings with the testimony to the court; that in such accounting he find the profits of said planing business during the time Noble carried the same on, also the amount of rents received by him up to the time the planing-mill was burned down, and the insurance money, if any, received by Noble. The decree directs the master as to the principles upon which the accounting is to be taken and the scope of the same, with leave to apply to the court for further directions. It is further provided that if anything is found due the complainants, the master shall report the same to the court, and that upon the coming in of his report, a final decree shall be entered ordering the conveyance of said lots to the complainants, and directing the administrators of Noble to pay them the amount found due, in due course of administration. It is further ordered that the amended bill and cross-bill be dismissed for want of equity as to all the other property described therein, and as to the relief prayed in relation to the title thereto and the rents and profits thereof.

The only contention made by counsel for the appellants is, that the evidence does not sustain the decree, and the questions presented for our consideration are therefore mere questions of fact. The evidence is very voluminous and in some degree conflicting, and we have given to it that patient and careful consideration which the importance as well as the difficulty of the questions presented have seemed to demand. The con-

clusions to which we have arrived are entirely in harmony with those reached by the learned chancellor who heard the case in the court below. To go into a complete discussion and analysis of the evidence in such way as to indicate our opinion as to the credibility of the several witnesses, and the proper probative force to be given to each of the various circumstances appearing in evidence, would serve no purpose of sufficient utility to justify us in extending this opinion to the length which our doing so would necessarily require. Such discussion would be of little or no service as a precedent in other cases, as each case, so far as concerns the credit due to the testimony of the witnesses and the effect to be given to the various facts to which they depose, must manifestly depend upon its own circumstances. The only object of such discussion would be to apprise the parties to this suit of our views as to the mere questions of fact and of evidence presented by the record, and we are happily relieved from the duty of entering upon it even for that purpose, by the exhaustive and satisfactory opinion filed by the chancellor in the Circuit Court, in which we are disposed to concur. See statement preceding this opinion.

After carefully considering the entire record, aided as we have been by the able arguments of counsel, we are of the opinion that the trust alleged by the complainants, so far as the same is established by the decree, is, when all the circumstances of the case are considered, proved by evidence which is clear and convincing. The defense of laches is not sustained. The clear preponderance of the evidence shows that both complainants were in ignorance of the existence of said trust and of the fraud which had been practiced upon them by its concealment until after Noble's death. Noble died December 15, 1885, and the original bill was filed June 29, 1886, and when we consider the period of over thirty-six years which had then elapsed since the creation of the trust and the manifest difficulty of investigating transactions so long past and of discovering and collecting the evidence by which they could be

proved, it can not be doubted that the complainants acted with reasonable promptness after becoming aware of their rights. The decree of the Circuit Court will be affirmed.

*Decree affirmed.*