The Chicago and Northwestern Railway Company *vs.* Ada S. Garrett *et al.*—(Jennie Henry *et al.* Appellees, *vs.* Priscilla Booth Walsh *et al.* Appellants.)

*Opinion filed October 26, 1912.*

1. Laches—*laches may be used as a defense independently of Statute of Limitations.* Laches may be used as a defense independently of the Statute of Limitations, and the question whether the defense shall be sustained depends largely upon the particular circumstances of each case.

2. Same—*doctrine of laches applies even to trustees or guardians.* The doctrine of *laches* is a defense to an action based upon alleged misconduct of a guardian where more than forty years have passed since the transactions in question, during which time most of the witnesses having knowledge of the facts have died, public records have been burned and documents lost, and where the evidence produced is so unsatisfactory that the granting of relief would rest largely upon conjecture.

3. Guardian and Ward—*what tends to show that the guardian was not negligent.* The fact that the adult owners of the equity of redemption quit-claimed their interests to the purchaser at the foreclosure sale instead of redeeming, tends to show that the guardian of the minor owners was not negligent in failing to redeem for his wards, particularly where the price paid was some four times the amount of the encumbrance and was a fair price for the land at that time.

4. Same—*what does not render sale to a guardian void.* The fact that the purchaser of land at a foreclosure sale, who paid the fair value of the land, bought for the purpose of selling it at the same price to the guardian of the minor owners of the equity of redemption, does not render the transaction void but only voidable at the suit of the interested parties, brought within a reasonable time after acquiring knowledge of the facts.

Vickers, J., dissenting.

Appeal from the Superior Court of Cook county; the Hon. Theodore Brentano, Judge, presiding.

David M. Ball, and E. W. Adkinson, for appellants.

Samuel H. Trude, for appellees.

Mr. Justice Carter delivered the opinion of the court:

In a condemnation proceeding filed in the superior court of Cook county in 1907 by the Chicago and Northwestern Railway Company against various owners of property included in the site now occupied by its new Chicago city passenger depot, the jury assessed the damages for the benefit of the owners of certain premises which for the purpose of this case may be described as No. 38 West Randolph street, at $22,000. All persons supposed to be interested in said property were made defendants, but before a finding was made by the court as to the owners, said $22,000 was in February, 1909, paid, by agreement, into the county treasury of Cook county for the benefit of the owners and parties interested, as thereafter to be ascertained. Appellees do not appear to have been made parties to the condemnation proceedings but filed their intervening or cross-petition on July 24, 1909, claiming that they were entitled to a part of said $22,000 fund. The controversy herein arises between the different claimants to said fund, appellants claiming as the heirs of Daniel Booth, deceased, while the appellees claim as the heirs of Joseph J. Kendrick, deceased, who owned the property prior to its being obtained by Booth. The trial court found that the heirs of Daniel Booth held title to an undivided third of the premises in trust for the use of appellees, and that the latter were entitled to one-third of the $22,000 deposited by the railway company with the county treasurer, and one-third of certain rents received by said Booth and his heirs, less such deductions as might thereafter be found proper.

The facts as shown by the record are, in substance, as follows: Joseph J. Kendrick died intestate May 7, 1857, seized of the premises in question, clear of encumbrance. On the front of the lot was a tavern kept by Kendrick and the family lived in a building at the rear. Kendrick left a widow, Mary Ann Kendrick, and one adult daughter, (who afterwards married a man by the name of Barker,)

and four minor children: Adeline Louise, who afterward married a man by the name of Meyer; Eliza Jane, who afterward married one Jackson; Joseph Henry Kendrick and George W. Kendrick. Daniel Booth was a farmer and justice of the peace, residing in the town of Jefferson, Cook county. He appears to have been an intimate friend of the Kendrick family and to have transacted considerable business for them. The records of Cook county having been burned during the great fire, the details concerning the management, control and transfer of this lot prior to October, 1871, are uncertain. There were introduced on the trial a copy of an abstract covering certain years, a private memorandum book of Daniel Booth, a few scattered documents with reference to the guardianship proceedings, and some oral testimony. From these it appears that Daniel Booth acted as administrator of the Kendrick estate, or at least performed the duties ordinarily performed by an administrator, and also acted as an agent in renting, and collecting the rents for, the property for the adult heirs and as guardian of the minor heirs. From the abstract in question it appears that August 16, 1859, he, as guardian of the four minor heirs, joined with the adult heir (Mrs. Barker) and the surviving wife of Kendrick, (who having re-married was then Mrs. Boedecker,) together with the husbands of the last two named, in giving a mortgage on the premises in question to James Booth. The amount secured by this mortgage does not appear. In Daniel Booth's account book there is a charge against him for "Booth, $460," which may or may not have been received on this mortgage. This item is not dated but appears in the accounts for the year 1860. A credit in this book dated December 21, 1860, reads: "Paid to J. Booth, principal and interest, $521.30." At nine per cent interest this would be slightly more than would be due on the mortgage if the principal had been $460, and at ten per cent a little less. A note introduced in evidence, dated July 10,

1866, indicates that money was then drawing nine per cent, and the amount found due in the foreclosure hereinafter mentioned indicates that the interest rate of that mortgage was ten per cent. The record does not show any release of this earlier mortgage. December 21, 1860, Daniel Booth, as the guardian of the minor heirs, united with the adult parties that joined in the earlier mortgage to give another mortgage to James Booth on the property in question to secure $900. The account book does not show a charge for this amount, but we find no reason from the record to assume that the money derived from the mortgage, except the minors' share, was paid to Daniel Booth. The accounts in the book in question do not purport to be an account of the guardianship estate, and we might infer that the guardianship matters were kept in another account, as there is an item in this account book, "By settlement in favor of guardian, $228.92," without any details as to what constituted that settlement. The items in the account book mainly concern rent and repairs on the property, which Booth would necessarily look after, if at all, so far as the adult owners were concerned, as agent and not as administrator. There are some documents and items in the record referring to the guardianship, but no connected series of accounts from which it is possible to make up a balance or tell what was actually done by the guardian as to the minors' share in this property. On December 11, 1863, James Booth filed a bill in the superior court of Cook county to foreclose the later mortgage. January 13, 1864, a guardian *ad litem* was appointed and five days later a decree of foreclosure entered, the amount found due being $1179. A master's sale was had in February, 1864, and a deed dated May 27, 1865, and filed for record shortly thereafter, was given for the premises in question to James Booth. The sale was for $4600. It must be presumed from this record that this purchase price was paid to the master and distributed by him to those who were entitled

to receive it.   March 17, 1864, less than a month after the sale, Mr. and Mrs. Boedecker, Mr. and Mrs. Barker, and Adeline Kendrick Meyer and her husband, joined in a quitclaim deed of the premises to James Booth, the stated consideration being one dollar.   Adeline Meyer was one of the daughters of Kendrick, becoming of age February 6, 1863, and before the date of the deed in question had married Charles E. Meyer.   She was the mother of appellees herein.   This deed was acknowledged before Daniel Booth as a justice of the peace.   James Booth was a brother of Daniel Booth, and was a farmer.   One of the witnesses testified that he had heard that James worked for Daniel Booth.   The record does not show much about the business or means of James, except that the abstract in question shows that he left sufficient property to be the subject of a partition suit and to cause his estate to be administered.   He died before the great fire.   April 2, 1866, he conveyed the premises in question to Daniel Booth for an expressed consideration of $4600.   This deed was not recorded until April 5, 1873.   July 10, 1866, Daniel and James Booth executed a note for $10,000, payable five years after date, and a trust deed was given by James Booth on the premises in question to secure said note.   From the record it appears that this money was used to erect a hotel on the property, which was known for many years as the Barnes House.   This trust deed was released in July, 1871, the release running to Daniel Booth.   We think it is clear from the record that Daniel Booth was known as the owner of this property for some years before the deed from his brother to himself was recorded, and that he had possession of, controlled and managed it and paid taxes and claimed title thereto until his death, in 1894, and that his heirs after his death claimed title through him, retaining possession and paying the taxes until the property was condemned by the Chicago and Northwestern Railway Company.

Appellees contend that a fiduciary relationship existed between the wife and children of Joseph J. Kendrick and Daniel Booth from the time of Kendrick's death until after Daniel Booth obtained title to the property here in question. The record shows that the adult daughter, Mary Ann Kendrick, in 1858 appointed Daniel Booth her attorney to rent her real estate and collect rent thereon, and it is a fair inference from the items in Daniel Booth's account book, and from certain other evidence in the record, that Daniel Booth had charge of the renting and collecting rents of 38 West Randolph street until the foreclosure sale, under which his brother, James Booth, purchased it. Appellees contend that all of the transactions with reference to the sale of this property under the foreclosure to James Booth, and the deeding thereafter by James to Daniel, were the result of collusion between the two, to the end that Daniel might ultimately obtain title; that Daniel Booth's conduct in these matters was in disregard of the fiduciary relations existing between him and the Kendrick children, and that in equity he became merely the trustee of said premises for the benefit of said children, under the deed from his brother James.

The principal question in this case is whether Daniel Booth took advantage of a fiduciary relationship existing between him and the children of Kendrick. The two mortgages in question given on this property to James Booth were not only signed by Daniel as guardian of the minor children, but by Kendrick's surviving wife and all adults who had any interest in the real estate, including the husbands of those who were married. While the record does not disclose for what either of these mortgages was given, it is a fair inference that the first one was given to raise money to pay debts against the estate or to help support the family of five children, and that the later mortgage was given, in part, at least, to take up the first one. From this record and at this late date the matter must be one of

conjecture. The fact that all of the adults signed would indicate that the mortgages were given for some valuable consideration. While the record is only a partial one as to the foreclosure of the second mortgage, it does show that a guardian *ad litem* was appointed and a master's sale had, which was confirmed by the court, and that the premises sold for $4600 while the amount due under the mortgage was only $1179. The only witness who testified as to the value of the property at the date of that sale was one called by appellees. According to his testimony $4600 was a fair price for the property at that time. Is it not reasonable to assume that James Booth, instead of bidding the amount of his judgment, paid what the land was fairly worth, with the understanding that the adult heirs should quit-claim to him their interests, as they did very shortly after the sale? The conduct of Daniel Booth, as guardian of the minor children, in permitting the redemption period to expire and taking title thereafter from his brother, should be subject to the strictest scrutiny in order to show that no fraud was practiced upon the minors. However, the fact that the adults consented to these arrangements so far as their own shares were concerned, tends strongly to show that the price was a fair one and that they did not think the property was worth enough more than it brought at the master's sale to make it advisable to redeem. There is nothing to indicate, in this record, that the price bid at the sale was not paid by James Booth, the purchaser, to the master in chancery, and that the latter did not divide this properly, as he was required by the law to do. The account book of Daniel Booth does not show any receipt as to the minors' share of this sale money from the master in chancery, but, as has been stated, it does not appear to be the guardianship account. The record does show a final settlement with Joseph Kendrick, one of the minor wards, in the year 1871, after he became of age, and a receipt for $468.70 to Daniel Booth, as guardian, in full of that share. It also

shows that the share of George W. Kendrick, another of the minors, amounting to $480.29, was paid by Daniel Booth, after said minor's death, to Charles E. Meyer, husband of Adeline Meyer, (who was a sister of George and the mother of the appellees herein,) for caring for George during a long sickness, resulting in his death in 1874, the Meyers giving bond to Booth that he would not suffer loss by paying the amount coming to George over to them on their claim. There is nothing in this record to show any settlement by Daniel Booth of his guardianship account with the other two minors. It does appear, however, that one of them, said Adeline L., the mother of appellees, who was a minor when the mortgages were given, became of age before the later mortgage was foreclosed, and that both she and her husband joined with her mother, stepfather, her older sister and brother-in-law in quit-claiming their interests in this property to James Booth after the foreclosure sale. This was over a year after she became of age. The record also shows that Mrs. Meyer lived in Chicago until the time of her death, in 1897, and it must be presumed that she knew that Daniel Booth was in possession and control of said premises, and claimed, during more than thirty years after she quit-claimed her interest in the property, to be the owner. If she could not recover from Daniel Booth or his heirs neither could appellees herein, her children.

The record shows that the two sons of Joseph J. Kendrick died unmarried,—Joseph after he became of age and George while still a minor,—leaving as their only heirs-at-law their three sisters, of whom Adeline L. was one. There is not the slightest evidence in this record that the sale by the master, in 1864, of the land here in question was not for a fair price and that Adeline L. Meyer did not receive her share from the proceeds of said sale direct from the master. Neither is there any evidence to indicate that Daniel Booth did not settle with her, after she became

of age, for whatever money he might have had as her guardian. Neither is there any evidence in the record to indicate that the amount paid to Joseph Kendrick after he became of age, and to Adeline Meyer and her husband for caring for George Kendrick, after his death, was not the proper amount due from Daniel Booth as guardian.

It is argued, however, that these amounts are less than one-fifth of the apparent net proceeds of the sale of the premises, and that therefore the guardian did not pay the two boys the amount they were entitled to. There is nothing in this record to indicate how much the surviving wife of Joseph Kendrick received from the sale by way of dower and homestead, what the net proceeds of the sale amounted to, or what the guardian paid for the support and education of his wards out of their respective shares. Adeline Meyer and her husband receipted for the money for the share of her brother George from Daniel Booth as guardian, and gave a bond that they would hold him harmless. The amount that Joseph received from Daniel Booth was not substantially different from the amount received and receipted for as George's share. From these facts is not the conclusion inevitable that Adeline Meyer received her full share of the sale of these premises direct from the master and that she settled in full for her share with the guardian, and that the amounts that the guardian paid were the amounts to which the two boys were entitled?

There is nothing in the record to indicate that James Booth bought this property at the master's sale in collusion with his brother, Daniel, for the purpose of ultimately deeding it to the latter, or to show that any of Daniel Booth's money went to pay the master for this purchase. On the contrary, it must be assumed that James Booth paid the money, and that he loaned the money for which the two mortgages were given. It is true that the deed from James Booth to Daniel Booth was not recorded until some seven years after it was made, but the testimony offered by ap-

pellees shows that it was understood by the children of Joseph J. Kendrick, deceased,—at least by Mrs. Jackson,— as early as 1865, and long before this deed was recorded, that Daniel Booth claimed to own the property and was in possession of it.   Two years after this deed was recorded Daniel Booth paid to Adeline Meyer and her husband the share of George Kendrick.   Mrs. Meyer lived for nearly twenty-five years after this deed was recorded.

Conceding, for the purposes of this case, that this property was sold to James Booth for the purpose of thereafter deeding it to his brother, Daniel, this would not render the transaction void but merely voidable.   It has ever been a principle of equity to discourage stale demands.   *Laches* may often be used as a defense, wholly independently of the Statute of Limitations.   (2 Pomeroy's Eq. Jur.— 3d ed.—sec. 965.)   No certain time can be stated as a limit beyond which relief will not be given.   Such relief is subject, necessarily, to the equitable discretion of the court and must depend to a great extent upon the circumstances of each case.   (1 Perry on Trusts,—6th ed.—sec. 228.) The mother of these appellees for some thirty years must have had knowledge of all the facts found in this record with reference to the title to this property and took no steps to secure the rights it is now claimed she had.   On the contrary, she acquiesced during all these years in all that had been done by Daniel Booth with reference to this property.   In the meantime most of the witnesses with knowledge of the transactions have died, the public records have been destroyed and most of the documents not burned cannot now be found.   The equitable doctrine of *laches* in such cases applies even as to trustees or guardians, (*Clary* v. *Schaack,* 253 Ill. 471; *Moore* v. *Taylor,* 251 id. 468; 1 Perry on Trusts, sec. 141;) and, we believe, should defeat the recovery here by appellees.

Counsel for appellees further contend that all of the evidence is not preserved in the bill of exceptions, and that

therefore the finding or decree of the trial court must be sustained. (*Baird* v. *Powers,* 131 Ill. 66.) Counsel are in error in this contention, as the bill of exceptions states that it contains all the evidence offered or heard on the trial.

Certain other questions are raised in the briefs which we do not deem it necessary to consider or decide.

The decree of the superior court should have held that appellees· had no interest in the fund in question. That decree will therefore be reversed and the cause remanded, with directions for further proceedings in harmony with the views herein set forth.

*Reversed and remanded, with directions.*

Mr. Justice Vickers, dissenting:

Considering the whole evidence as the same appears in this record, I am impressed that the finding of the court below is correct. While the mother of the appellees was between nineteen and twenty years old when the master's deed to James Booth was made and about twenty years of age when James Booth conveyed to Daniel Booth, still the evidence shows that Daniel Booth had not settled his guardian account with her, and that he continued to sustain a fiduciary relation to all the members of the Kendrick family for several years after he acquired the title to this property. While thus occupying a trust relation to the Kendrick family, including the mother of the appellees, he was himself the holder of the legal title to their property under an unrecorded and undisclosed deed from his brother, James Booth. After the premises had been sold under the mortgage to James Booth, instead of making an effort to redeem and save the property for his wards, we find him participating and co-operating in an effort to strengthen the position and title of his brother by permitting his wards to acknowledge before him, as justice of the peace, in consideration of one dollar, a quit-claim deed, thereby cutting off the right to redeem. This quit-claim deed was exe-

cuted by them more than ten months before the time of redemption under the foreclosure sale expired. In about three months after the time of redemption expired James and Daniel Booth procured a loan of $10,000 upon these premises with which to build the Barnes House. The evidence establishes a fiduciary relation between Daniel Booth and the mother of appellees, and from that relation the law casts upon appellants the burden of showing, by satisfactory evidence, that any conveyances or transactions between the trustee and *cestui que trust* were fair and entered into with the full knowledge of all the material facts by the *cestui que trust*,—and this rule applies even after the ward attains his majority, if the relation has not been terminated. (*McParland* v. *Larkin,* 155 Ill. 84; *Fish* v. *Fish,* 235 id. 396.) Clearly, the mother of the appellees looked upon Daniel Booth as taking the place of her father. He was entrusted by her with the entire control of all the business affairs of the Kendrick family. The inference that the quit-claim deed to James Booth in consideration of one dollar was executed at the solicitation and through the influence of Daniel Booth, and as a direct result of the influence which his relation to Adeline Meyer gave him, is irresistible. Why should she or any of the other adult heirs want to make James Booth a present of their equity of redemption in this property? Was it to their interest to do so? Would they have signed such a deed without consulting with Daniel Booth, who was not only their guardian but the confidential adviser and business manager of the family? If the mortgaging of these premises by the guardian, the neglect to redeem, the foreclosure sale, the purchase by James, the subsequent strengthening of his title by the quit-claim deed and the conveyance by James back to the guardian were all steps permitted and taken by Daniel Booth with the fraudulent purpose of ultimately getting the title to his wards' property in his own name and for his benefit, in plain and palpable violation of the trust re-

lation which he sustained, then, as between the guardian and his wards, the law regards the property thus acquired by the trustee as belonging to the beneficiaries in the trust. I think the evidence in this case presents a situation calling for the application of this salutary rule of law. Appellants, as heirs of Daniel Booth, stand in his shoes, and have no higher or greater equities than their father would have were he living and contesting the rights of appellees.

With reference to the defenses which are interposed by the heirs of Daniel Booth, it may be said that the Statute of Limitations cannot be invoked at the instance of one who holds title to the premises as trustee, against the *cestui que trust.* (*Hayward* v. *Gunn,* 82 Ill. 385; *Reynolds* v. *Sumner,* 126 id. 58; *Ross* v. *Payson,* 160 id. 349.) The defense of *laches* may sometimes be invoked in cases of this kind, but courts do not ordinarily favor the application of *laches* to trust funds. (*Smith* v. *Ramsey,* 1 Gilm. 373; *Middaugh* v. *Fox,* 135 Ill. 344.) Such defense is never allowed except where the evidence shows unreasonable delay after knowledge of the facts has been acquired. In the case at bar there has been a great delay,—more than forty years,—in asserting the rights of appellees, but the evidence shows that the knowledge of the fraud perpetrated upon appellees and their mother did not come to their knowledge until an examination was being made with a view of bringing the present condemnation suit; that the first knowledge that was acquired came through a letter of inquiry dated January 3, 1908, and written to Walter Barker by David M. Ball, an attorney who was investigating the title. This letter of inquiry led to an examination of the records and books which have heretofore been referred to, and it was then discovered for the first time that Daniel Booth had acquired title to these premises in fraud of the rights of his wards. There has been no delay, after a discovery of the fraud, in asserting the rights of appellees. The rule is established by many

authorities that there must be knowledge of the fraud, and acquiescence, before *laches* can be interposed as a bar. *Mc-Parland* v. *Larkin, supra.*