MARY CARTER

*v.*

JOHN TICE *et al.*

*Filed at Springfield March 23, 1887.*

1. GUARDIAN AND WARD—*release of guardian by ward—undue influence.* A release of a guardian and his sureties by the ward, after her majority, she being a daughter of the former, and living with him, and ignorant of her rights, without any payment or consideration, amounting to a virtual gift to the father and guardian, will, from the confidential relation between the parties, be presumed to have been obtained by undue influence, and the obtaining of it a constructive fraud on the ward; and where the guardian's sureties are parties to the transaction, such release will be invalid as to them, as well as the guardian.

2. LIMITATION—*as against a ward while under guardian's influence.* In respect to the enforcing of the rights of a ward against the guardian and his sureties, there is much authority that time will not run against the ward while living with the guardian, and is under his influence and control, even after the majority of the ward. And when the further relation of parent and child exists between the guardian and ward, and the latter living with him, and being under his dominion, that will make the rule especially applicable.

3. SAME—*application in equity.* The bar of the Statute of Limitations will not be applied, in equity, so long as an action at law will lie upon the instrument upon which the proceeding in equity is predicated.

4. Where a bill was filed by a ward within ten years after arriving at majority, against her guardian and his sureties on his bond, for an account, and the payment of the moneys due the ward, and to set aside a release given without consideration and in ignorance of the ward's rights, the sureties having full notice that such release was fraudulently obtained, it was *held*, that there was no such *laches* on her part as to bar the relief sought, as the sureties in such case had no right to rely on the release.

APPEAL from the Appellate Court for the Third District;— heard in that court on appeal from the Circuit Court of Menard county; the Hon. CYRUS EPLER, Judge, presiding.

Mr. N. W. BRANSON, for the appellant:

Where a gift, bounty, release or other gratuity proceeds from ward to guardian, during the existence or shortly after the determination of the relation of guardian and ward, it is an invariable presumption of law that the gift was procured by fraud or undue influence; and such presumption arises from the mere relation of the parties, without further proof. *Wright* v. *Arnold,* 14 B. Mon. 638; *Ferguson* v. *Lowry,* 54 Ala. 510; *Womack* v. *Austin,* 1 S. C. 421; *Butler* v. *Haskell,* 4 Des. 704; *Morse* v. *Royal,* 12 Ves. 371; *Sears* v. *Shafer,* 1 Barb. 417; *Meek* v. *Perry,* 36 Miss. 190; *Harvey* v. *Mount,* 8 Beav. 452; *Griffiths* v. *Robbins,* 3 Mad. 105; *Richardson* v. *Linney,* 7 B. Mon. 571.

And a release or bounty so given will be set aside by a court of equity, upon the ground of public policy, without proof of actual fraud. *Meek* v. *Perry,* 36 Miss. 250; *Welles* v. *Middleton,* 1 Cox's Cases, 112; *Ormond* v. *Hutchinson,* 13 Ves. Jr. 47; *Harris* v. *Carstarphen,* 69 N. C. 416; *Waller* v. *Armistead,* 2 Leigh, (Va.) 11; *Hatch* v. *Hatch,* 9 Ves. 292; *Garvin* v. *Williams,* 50 Mo. 201; *Say* v. *Barnes,* 4 S. & R. 112.

Such presumption of fraud or undue influence having once arisen, the court will view the whole transaction with an almost invincible jealousy, and will require of the defendants clear and distinct evidence which shall completely overthrow

and repel the presumption which the law so raises. *Hatch* v. *Hatch,* 9 Ves. 297; *Dawson* v. *Massey,* 1 Ball & B. 232; *Cadwallader* v. *West,* 48 Mo. 502; *Aylward* v. *Kearing,* 2 Ball & B. 478.

It must be shown, not merely that the person likely to be influenced fully understood the act he was performing, but also that his consent to perform that act was not obtained by reason of the influence possessed by the person receiving the benefit. *Hoghton* v. *Hoghton,* 15 Beav. 299.

Such evidence must be furnished by the beneficiary, the ordinary rules of evidence as to the burden of proof being reversed by the rule of equity which presumes fraud from the existence of confidential relations between the parties, and benefit to the party having influence over the other. *Wade* v. *Pulsifer,* 54 Vt. 45; *Garvin* v. *Williams,* 50 Mo. 201; *Meek* v. *Perry,* 36 Miss. 190; *Huguenin* v. *Baseley,* 14 Ves. 300.

The gift will not be sustained unless the ward had the benefit of competent, independent and disinterested advice. *Harris* v. *Carstarphen,* 69 N. C. 416; *Malone* v. *Kelley,* 54 Ala. 532; *Wade* v. *Pulsifer,* 54 Vt. 45; *Coke* v. *Lamotte,* 15 Beav. 243.

The fact, that at the time of the gift the ward was a member of the guardian's family, and in daily intercourse with him, greatly strengthens the presumption of fraud and undue influence. *Harvey* v. *Mount,* 8 Beav. 447; *Archer* v. *Hudson,* 7 id. 558; *Aylward* v. *Kearney,* 2 Ball & B. 478; *Hatch* v. *Hatch,* 9 Ves. 297.

The obligation of complete disclosure on the part of the guardian, always arises from the relation of guardian and ward. 2 Pomeroy's Eq. Jur. sec. 902, and cases cited; *Hall* v. *Cone,* 5 Day, (Conn.) 543; *Hunter* v. *Atkins,* 3 M. & K. 135; *Darlington's Appeal,* 86 Pa. St. 512; *Dalby* v. *Monham,* 33 Beav. 154; *Kay* v. *Smith,* 21 id. 522; *Fish* v. *Miller,* 1 Hoffm. Ch. 270; *Womack* v. *Austin,* 1 S. C. 421; *Gregory* v. *Orr,* 61 Miss. 307.

Unless it be shown that the ward acted voluntarily, understandingly, and with the fullest deliberation, the gift will not be sustained. *Wade* v. *Pulsifer*, 54 Vt. 45; *Gregory* v. *Orr*, 61 Miss. 307; *Womack* v. *Austin*, 1 S. C. 421; *Sullivan* v. *Blackwell*, 28 Miss. 737; *Richardson* v. *Linney*, 7 B. Mon. 571; *Wright* v. *Arnold*, 14 id. 638; *Spalding* v. *Brent*, 3 Md. Ch. 411; *Williams* v. *Powell*, 1 Ired. Eq. 460.

The bar of the statute will not be applied, in equity, so long as an action at law will lie upon the instrument. Wood on Limitations, 117; *Gibbons* v. *Hoag*, 95 Ill. 45; *Greenman* v. *Greenman*, 107 id. 411; *Castner* v. *Walrod*, 83 id. 171; *Harris* v. *Mills*, 28 id. 44; *Rucker* v. *Dooley*, 49 id. 377; *Hancock* v. *Harper*, 86 id. 445; *Quayle* v. *Guild*, 91 id. 378; *Furlong* v. *Riley*, 103 id. 628.

If the injured party is under the influence or control of a former guardian or trustee, time will not run against him. *Hayden* v. *Stone*, 1 Duv. 395; 2 Perry on Trusts, sec. 805.

Mr. T. W. McNEELY, for the appellees:

There is a difference between influence and undue influence. It is necessary to prove the latter, to set aside contracts between parents and children. 1 Perry on Trusts, secs. 200, 201; Bump's Kerr on Fraud, 177; *Jenkins* v. *Pye*, 12 Pet. 253.

Wynne, and especially appellees, perpetrated no fraud on appellant.

The act of appellant releasing the sureties was not a gift. It was a contract with her father,—a settlement. *Kirby* v. *Taylor*, 6 Johns. 242.

The delay in taking steps to avoid the release, prevented the sureties from seeking indemnity. *Wardlow* v. *Gray*, 2 Hill, 644.

When a person, by his words or acts, causes another to believe in the existence of a state of things, and induces him to act on that belief so as to change his position, he will be estopped to aver against the latter a different state of things. 2 Smith's Leading Cases, 542; *Dazell* v. *Odell*, 3 Hill, 219.

When a party is lulled into security by delay, or into omitting to do that which would have saved him from loss had the right of another been promptly asserted, the defence of *laches* is good. *Gibbons* v. *Hoag,* 95 Ill. 45.

Appellant says, however, that she is not barred until the Statute of Limitations would have barred a suit on the guardian's bond. On the contrary, it has been held that when a matter is purely equitable, the court will refuse relief if the plaintiff has been guilty of *laches* in asserting his rights, and a demand will often be regarded as stale, even though the time which has elapsed is less than the statutory period in analogous cases. *Spaulding* v̇. *Farwell,* 70 Me. 17; *Sullivan* v. *Railroad Co.* 94 U. S. 806.

Mr. JUSTICE SHELDON delivered the opinion of the Court:

On May 21, 1870, Clinton Wynne was appointed guardian of his daughter, Mary Wynne, (now Carter,) the appellant, by the county court of Menard county, in this State,—the appellees, John Tice, Milton B. Harrison and Daniel F. Fouche, being sureties on his guardian's bond; and on the same day, Wynne, as such guardian, received the sum of $1568, belonging to his said ward. Appellant, at this time, was between eleven and twelve years of age. In March, 1871, Wynne removed, with his family, to Wilson county, Kansas, where he has ever since resided, and there appellant resided with him, as a member of his family, from March, 1871, until October, 1881. Appellant became eighteen years of age on September 17, 1876. Early in 1877, the appellees sent Mr. Tice, of their number, at their joint expense, to Wynne's home in Kansas, to take some action in regard to the guardianship. Tice took with him a blank guardian's report, and also a form of a receipt, to be signed by the ward. He arrived at Wynne's home on the evening of February 1, 1877. The next morning, the two together, (Tice and Wynne,) prepared what purports to be a report of Wynne, as appellant's guardian, and Tice pre-

pared a release from the form he had brought with him. This was in the absence of appellant, and before she had received any information as to the purpose of Tice's visit. While the report and release were being prepared, appellant had gone to the barn to get a horse to ride to school, and as Wynne testifies : "I went to her, and told her my securities as her guardian wanted it settled up, and if she would sign the receipt to release them, I would give her a mortgage on everything I had. She said she would do anything to relieve me; that she did not want me to ever name it to her again, for she wished she had never had an inheritance. She then went into the house with me. Mr. Tice then showed her the report above referred to, and the receipt. He told her to read them. Whether she did or not, I can not say. She signed the receipt. She then got on her horse and went off to school. That is all that was said or done by me, or her, or Tice, in regard to such settlement.". He stated, afterward, that she read the receipt. The receipt was as follows :

"FREDONIA, WILSON COUNTY, KAN., *February 2, 1877.*

"Received of Clinton Wynne, guardian of Mary Wynne, as appears from the records of the county court of Menard county, Illinois, $1464.96, which is in full of the amount due me from said guardian, as per final report and settlement of said guardian with the court aforesaid ; and I hereby release and hold harmless the said guardian and his securities from all liabilities whatever of said guardianship.

"Given under my hand and seal the day and date above written.                    MARY WYNNE. [Seal.]
    Attest : FANNIE WYNNE."

In preparing the guardian's report, Tice and Wynne charged the latter with the sum of $1568, received by him May 21, 1870, and six per cent interest thereon, aggregating $2264.96. Then they credited him with the sum of $800 for appellant's maintenance, and then, ascertaining the difference between

said two sums, they credited Wynne with such difference, to-wit, $1464.96, in this form:

"*Feb. 2, 1877*—By cash paid Mary Wynne, in full
of balance found due her as per this settle-
ment, as per voucher No. 1. . . . . $1464.96."

As to the $800 charge for maintenance, Wynne testifies: "Part of the time I kept an account of money paid out by me for board, and part of the time I did not. I approximated the $800 charged in my account, from the account I kept." And he says he told Mr. Tice he thought Molly (appellant) would release the sureties, and she and he could arrange the matter between themselves. Tice left that day, bringing the report and the receipt home with him, had the same filed in the county court, and an order of court was made approving the report and discharging the guardian. This was done in the absence of appellant, and without notice to her, and no one represented her interests.

On May 7, 1885, appellant filed her bill in chancery in the circuit court of Menard county, against her guardian and the sureties on his bond as guardian, to set aside said release and discharge, and to enforce the defendants' liability on such bond for the amount due from such guardian to his ward, the appellant. There was a decree in the circuit court against the guardian and his sureties, for the sum of $2199, from which the sureties appealed to the Appellate Court for the Third District, where the decree was affirmed as to the guardian, but reversed as to the sureties, from which judgment of the Appellate Court, the complainant, Mary Carter, prosecutes this appeal.

With respect to the occurrence of the alleged settlement, the testimony of appellant was, that in the morning, after she had started to school, her father came to her in the barn where she had gone for the horse, and said: "I don't want you to go away yet, for I have a paper in the house I want

you to sign." "I said, 'Well,' and he said if I would, he would give me a mortgage on everything he had. We went to the house, and Mr. Tice handed me the paper, and told me to read it over before I signed it. I read it over and signed it. I had no other conversation with either of them about the paper before signing it. They had no conversation about that business in my presence." She said her father had never given her a mortgage; that he never afterward said anything to her about the paper; that she signed the paper because her father told her to; that she did not know the effect of the paper at the time she signed it; that she thought it was something that wholly concerned her father, and that her interest was in no way involved; that she did not then know her father was her guardian, nor that he had received any money belonging to her; that in October, 1881, she left her father's home, and removed to Menard county, in this State, and that she then and there, for the first time, became fully aware of the nature and character of this paper she had signed on February 2, 1877; that before that time, her father had never given her any information as to her money or property in his hands, or as to her pecuniary interests, and had never informed her he was her guardian, and that, for the first time, she became aware of the filing of the guardian's report, and of its nature, in 1883 or 1884, after her marriage, in October, 1883, and that she did not learn that, as a matter of law, the paper she signed had not released the sureties, until 1884.

There is nothing in the record in any way contradictory of appellant's statement of having been kept in ignorance as to the guardianship and her property, more than may be found in the following testimony of her father: "From the time I was appointed guardian, in 1870, until February, 1877, my daughter, the appellant, lived with me as one of the members of my family, and we were all this time on the most intimate terms, and not a word was ever said to her, or in her pres-

ence, of the fact that, in 1870, I had been appointed her guardian, and had received about $1500 for her, and that I had continued her guardian during all that time, except that in 1870 I told her I was her guardian. That is all the talk we ever had about the matter, that I remember." He stated subsequently, on a reëxamination: "As near as I remember, in 1870 appellant said to me that her aunt had told her I was appointed her guardian, and she must have me keep her money out at interest. She asked me if that was the fact, and I told her it was." Appellant's property in question came to her from the estate of her deceased mother, who died some time previous to 1867, her father in that year contracting a second marriage.

The transaction in question, by which this ward, after the termination of the guardianship, was induced, at the solicitation of her guardian, to gratuitously release to him all her property, of quite an amount, in his hands, can not stand for one moment, on the best settled legal principles which have been established for the protection of infants. The release was a virtual gift by the ward, to the guardian and his sureties, of her entire estate, and, from the confidential relation between the parties, is presumed to have been executed under undue influence, and the obtaining of it was at least a constructive fraud. The principle which applies in such a case is thus stated in 1 Story's Eq. Jur. sec. 317: "It is obvious, that during the existence of the guardianship the transactions of the guardian can not be binding upon the ward, if they are of any disadvantage to him; and, indeed, the relative situation of the parties imposes a general inability to deal with each other. But courts of equity proceed yet further in cases of this sort. They will not permit transactions between guardians and wards to stand, even when they have occurred after the minority has ceased, and the relation become thereby actually ended, if the intermediate period be short, unless the circumstances demonstrate, in the highest sense of the terms,

the fullest deliberation on the part of the ward, and the most abundant good faith (*uberrima fides*) on the part of the guardian. For, in all such cases, the relation is still considered as having an undue influence upon the mind of the ward, and as virtually subsisting, especially if all the duties attached to the situation have not ceased,—as, if the accounts between the parties have not been fully settled, or if the estate still remains, in some sort, under the control of the guardian." To the same effect is 2 Pomeroy's Eq. Jur. sec. 961.

The doctrine is abundantly sustained by the authorities cited by the authors; and see, particularly, the many authorities referred to in the notes to the last named citation; and see *Hall* v. *Cone*, 5 Day, 548; *Garvin* v. *Williams*, 44 Mo. 465; 50 id. 206; *Wade* v. *Pulsifer*, 54 Vt. 45. There was, here, the further relation of parent and child, which adds strength to the case of the complainant, the child then yet living with the parent, and being under his dominion. See 2 Pomeroy's Eq. Jur. sec. 962.

The bare statement of the facts of this case, with the principle applying to them, plainly establishes the invalidity of the release in question. Any further enlargement, in the way of comment, upon the facts, or of argument, would be mere superfluity. The sureties of the guardian, through one of their number, having actively participated in obtaining the release, it is invalid as to them, alike as to the guardian.

The only question which there is in the case, in our view, is, whether the complainant should not be held to be barred of her remedy by reason of the delay in bringing her suit. The transaction of giving the release occurred February 2, 1877. The suit was commenced May 7, 1885. Appellant remained a member of her father's family, living with him at his home and under his dominion, until October, 1881, when she ceased to live with her father, and then, as she testifies, for the first time she became aware of the nature of the paper which she signed February 2, 1877, and that she did not learn

of its invalidity, and that it was not binding upon her, until in 1884.

There is much of authority to the point, that time would not run against appellant during the time she was living with her father and guardian, and under his influence and control. (2 Perry on Trusts, secs. 864, 865; Kerr on Fraud and Mistake, 311.) The suit is for the purpose of enforcing the liability of the defendants under the guardian's bond. Under the Statute of Limitations, appellant had ten years after her right of action accrued, within which to sue upon the bond, and this suit was brought within that time. There was no occasion for any movement to have the release set aside until proceeding was taken to enforce the liability upon the bond, when there might be set up the release, in bar of the remedy sought. Because appellant had not earlier taken steps to have this release set aside, which the defendants themselves had fraudulently interposed as a technical obstacle to an action at law upon the bond, would not seem to be any just cause of complaint on their part. The statutory bar will not be applied, in equity, so long as an action at law will lie upon the instrument upon which the equitable action is predicated. Wood on Limitations, 117.

But it is said, as to the sureties, that they relied upon the release as a discharge of their obligation, and may have been led thereby not to obtain indemnity against their liability, which otherwise they might have procured. Any blame in this respect rests upon the sureties themselves, and is not properly chargeable against appellant. She herself did nothing more than to sign her name to the paper of February 2, 1877, purporting to be a receipt of $1464.96, and a release, which these sureties, by one of their number, prepared for her to sign. They, through Tice, knew it to be a false document, and also knew, or ought to have known, that it was a fraudulent one. They knew there was no money received. So, also, when Tice, the surety, wrote down in the guardian's report,

prepared at the same time, a credit of date February 2, 1877, "By cash paid Mary Wynne, in full of balance found due her as per this settlement, $1464.96," he knew that to be false,—that there was, at that time, no money whatever paid to her. There was, confessedly, at that date of February 2, 1877, $1464.96 of the ward's moneys in the hands of her guardian. It was his duty to then pay it over to his ward. The sureties had entered into an obligation on their part that he should pay the money to her. Instead of this being done, the guardian and one of the sureties sit down, and between themselves make out and prepare this guardian's report and paper of February 2, 1877, and this young girl, who had started for school, is called back, and not as her own spontaneous act, but at the solicitation of her guardian and father, with whom she was living in her dependent situation, without any disclosure of facts to her, with no disinterested adviser present, without any deliberation, reads the paper, hurriedly, and not understandingly, as may be presumed, signs her name to it, and starts away to school,—and this paper, thus obtained, it is said, the sureties relied on as a discharge of their obligation that this money should be paid over to the ward. It was no discharge. There was nothing paid or received, and nothing discharged.

The sureties had no right to rely upon this paper purporting to be a release, as a discharge of their liability upon the bond; and they should not have been misled by any want of action to have the release set aside, there being no occasion, as before observed, for any such action, until appellant came to enforce the liability upon the bond, and this fraudulently obtained release would be set up in defence.

We do not think there has been, here, any *laches* which should be held to bar the suit, either as against principal or sureties.

The judgment of the Appellate Court will be reversed, and the decree of the circuit court is affirmed.

*Judgment reversed.*