84:28 LRA 853n

James McParland et al.

v.

Margaret Larkin.

*Filed at Ottawa January 15, 1895.*

1. EVIDENCE—*burden of proof to show good faith in dealing with ward.* The burden of proof rests upon the wife of a guardian, to whom the ward, within a few days after attaining her majority but before the termination of the guardianship, conveyed real estate for an inadequate compensation, to show good faith, absence of influence by the guardian and knowledge of and free consent to the transaction by the ward, especially where the grantee stood *in loco parentis* to the ward.

2. GUARDIAN AND WARD—*when ward need not refund consideration.* The repayment by a ward of money received for an invalid conveyance of land which her guardian induced her to make to his wife, will not be imposed as a condition of canceling the conveyance, where the guardian owes the ward a large sum, on which the amount can be credited.

3. SAME—*right of grantee of ward to cost of improvements.* A grantee of real property, chargeable with notice of the infirmity of her title by reason of the improper influence of a guardian in procuring the execution of the deed, is not entitled, upon its cancellation, to reimbursement for the cost of permanent improvements made upon the property, but the court may, in the exercise of its equity powers, protect the indebtedness incurred for improvements upon the property, upon the theory that it has been benefited and that the ward will receive an advantage thereby.

4. SAME—*ward not chargeable with improvements made without authority.* The estate of a ward cannot be incumbered or charged with the cost of improvements made upon the estate during his minority, and without authority of the probate court, where he elects to repudiate all liability therefor.

5. TENANTS IN COMMON—*when a tenant in common must account for rents.* A tenant in common who occupies premises to the exclusion of his co-tenants, must account to them for their share of the rental value of the premises.

APPEAL from the Circuit Court of Cook county; the Hon. LORIN C. COLLINS, Judge, presiding.

M. J. DUNNE, and ARNOLD TRIPP, for appellants.

WILLIAM J. ENGLISH, for appellee.

Per CURIAM:  In March, 1880, James Fitzgerald died seized in fee of lots 72, 73, 74 and 75, of sub-lot or block 42, in canal trustees' subdivision of section 33, township 40, north, range 14, east of the third principal meridian, in Cook county, Illinois, which lots, with the cottage thereon, constituted the family homestead.  He left surviving him, as his children and heirs-at-law, Edward Fitzgerald, Mary Ann McParland and Margaret Fitzgerald, the latter then a minor of sixteen years, who, after attaining majority, married one Larkin, and is the complainant (appellee) in this case.  The decedent also left, as his widow, Bridget Fitzgerald, step-mother of said children.  In addition to said realty he also left $2000 life insurance, payable to his children.

James McParland, husband of the daughter Mary Ann, was duly appointed administrator of the estate and guardian of the person and property of said minor child.  In consideration of $1100 the widow relinquished her award, dower and homestead rights, the money for this purpose being advanced, it seems, by the children, Edward and Mary Ann, out of their share of the insurance money, and were to be reimbursed, for the proportion thereof falling upon Margaret, out of the latter's one-third interest in the estate.  The estate being somewhat involved in debt, means were devised for paying the indebtedness without sale of the realty.  Edward and Mary Ann each advanced a third, the other third being advanced out of said minor's estate by order of the probate court.  In 1880 Edward sold and conveyed his one-third interest in the realty to his sister Mary Ann, for the sum of $980.  The minor, Margaret, until her marriage to Larkin, in June, 1882, made her home with her sister, Mrs. McParland, and her husband, who occupied the premises.  They, it would seem, stood *in loco parentis* to the minor.  They cared for her as though she was their child, sending her to school, etc., no charges for board, clothing and other necessaries, at the times they were furnished, being made.

On February 24, 1882, six days after attaining her majority, Margaret executed a deed, purporting to convey to her sister, Mary Ann McParland, her one-third interest in said real estate, at which time she was paid a small sum of money. This deed, as alleged in the bill, was procured by deception and undue influence exerted by her guardian, James McParland, over her, and without knowledge on her part of her rights in the premises or of what was due her out of the estate of her father, and that said deed was executed relying solely upon her guardian, in whom she had great confidence, and that, in fact, she was not aware of having conveyed away her interest until a short time before the filing of her bill. The sister, Mrs. McParland, testified that she tried to take her mother's place toward complainant, and that the latter looked up to her as such, and the evidence tends strongly to show that complainant looked to her guardian as taking the place of her father. The guardian did not make his final report until the 25th of May following the making of said deed, so that, in effect, the guardianship continued until long after the making thereof. *Gilbert* v. *Guptil*, 34 Ill. 112; Schouler on Domestic Relations, sec. 382.

It is, however, contended, that the deed was made, with full knowledge of all the facts, six days after complainant had arrived at her majority, without undue influence and for a good and sufficient consideration, and its validity is not, therefore, to be questioned. It will be readily admitted that if the parties were dealing at arm's length, fraud must be shown to justify setting aside the deed; (*Baird* v. *Jackson*, 98 Ill. 78; *Warrick* v. *Hull*, 102 id. 280;) and it may be generally said, that where the guardianship has terminated and the influence of the guardian upon the ward has ceased, so that they can be said to stand upon an equality, transactions between them will be regarded as binding. (Schouler on Domestic Relations, sec. 389.) "But such transactions are always

to be regarded with suspicion; and where the influence still continues, as, if the ward be a female or a person of weak understanding, and the guardian continues to control the property or to furnish a home, the court is strongly disposed to set aside the bargain altogether." But these observations have but little, if any, bearing here, as in this case the relation of guardian and ward has not been legally dissolved. In such case, as said by Pomeroy, (2 Eq. Jur. 961): "The relation is so intimate, the dependence so complete, the influence so great, that any transactions between the two parties, or by the guardian alone, through which the guardian obtains a benefit, entered into while the relation exists, are in the highest degree suspicious. The presumption against them is so strong that it is hardly possible for them to be sustained." So in *Gillette* v. *Wiley*, 126 Ill. 310, where the guardian procured his ward, after the latter, a young man, had attained his majority, to sign a receipt in full for all money which came into his hands as guardian, the ward not reading the paper or acquainting himself with its contents, but relying solely on the statement of his guardian as to its character and purport, it was held that the transaction was void, even as against a surety upon such guardian's bond, who had taken a mortgage on the latter's land as indemnity against loss as surety; and it was there said: "Ordinarily, one having the means of information as to the contents of a paper executed by him, will * * * be held to have known the contents, and will not be permitted to assert his ignorance of its contents to avoid responsibility according to its real import. Here, however, the signing of this receipt was the will and act of the guardian, rather than that of appellee. Courts will watch settlements of guardians with their wards, or any act or transaction between them affecting the estate of the ward, with great jealousy. From the confidential relation between the parties it will be presumed that the ward was acting under the influence of the guardian,

and all transactions between them, prejudicially affecting the interests of the ward, will be held to be constructively fraudulent. (*Carter* v. *Tice et al.* 120 Ill. 277.) The doctrine is thus stated in 1 Story's Eq. Jur. sec. 217: Where the guardianship has, in fact, ceased, by the majority of the ward, the courts 'will not permit transactions between guardians and wards to stand, even when they have occurred after the minority has ceased, and the relation become thereby actually ended, if the intermediate period be short, unless the circumstances demonstrate, in the highest sense of the term, the fullest deliberation on the part of the ward and the most abundant good faith on the part of the guardian, for in all such cases the relation is still considered as having an undue influence upon the mind of the ward, and as virtually subsisting, especially if all the duties attached to the situation have not ceased,—as, if the accounts between the parties have not been fully settled, or if the estate still remains, in some sort, under the control of the guardian.'"

Here the ward was a female, barely past the age of eighteen years, and practically without knowledge or experience in business affairs. The peculiar interests of the guardian were opposed to her own. His wife then owned the other two-thirds of the realty in question, and by this deed was acquiring the third belonging to the ward. The ward was induced to execute a deed prepared by the guardian for her signature, for an inadequate consideration,—greatly less than the real value of her interest, unless there be taken into consideration her prior support and maintenance in her sister's family. True, the presumption of undue influence of the guardian is attempted to be overthrown by proof. But as said in the case just quoted from, "the presumption of influence on the part of the guardian, and the dependence of the ward, continues after the legal condition of guardianship has ended, and transactions between them, during the continuance of the presumed influence of the guardian, will

be set aside, unless shown to have been the deliberate act of the ward, after full knowledge of her rights. In all such cases 'the burden rests heavily upon the guardian to prove the circumstances of knowledge and free consent on the part of the ward, good faith and absence of influence, which alone can overcome the presumption.'" It is not necessary, in such cases, that actual and intentional fraud be established. It is sufficient, when the parties sustained the relation of guardian and ward, that the former has gained some advantage by the transaction with his ward, to throw the burthen of proving good faith and absence of influence, and of knowledge and free consent of the ward, upon the guardian. This we are not prepared, after the most careful consideration of the evidence, to say has been done, and the decree of the chancellor setting aside the deed must be affirmed. Nor can it make the slightest difference that the conveyance was made to the wife of the guardian, under whom he subsequently acquired title. As already seen, both the husband and wife stood in the relation of parents to complainant, while the husband was guardian. The relations precluded their deriving advantage from the ward, and it was their duty to protect her estate from spoliation, from whatever source.

It is next insisted that in respect of the $860 which constituted the consideration for the deed, the court should, by its decree, have required return by the ward of the amount, or a sale of the ward's interest in the premises to pay it, as a condition upon which the deed should be canceled. This contention is without merit. It is true, that in case of sale and conveyance of land by the ward to the guardian, where the ward afterward elects to repudiate the transaction and seeks in equity to have the deed set aside, he must do equity and pay back to the guardian the amount received, or else suffer a decree charging his land with sale to satisfy the same. (*Wickiser* v. *Cook*, 85 Ill. 68.) But such is not the case

here. By the findings of the master, approved by the court, large sums of money were found due the ward from the guardian, and in the settlement of which the court, by its decree, credited the guardian with the above amount, which was equivalent to a payment in money. It would be useless for the court to make the consideration paid a charge on the ward's land, when, by an adjustment of the accounts due between them, it could, and in fact should, be deducted. There was no occasion for such an order, when the guardian could be paid by simply deducting it from the amount owing to the ward.

It is further insisted that appellee should take her interest in the property as it was at the date of the deed; that all improvements made thereon belonged to appellants, subject to the right of appellee to obtain title thereto by contribution of her share of the cost or present value thereof, and the doctrine in respect of tenants in common, that where one tenant makes improvements on the premises held by them in common, the court, in making partition, should require due compensation therefor from the other tenants to be made, is invoked in support of this view. The court found that Mary Ann McParland, grantee in the deed, "was not an innocent purchaser of said real estate, but was charged with and had full knowledge of the fiduciary relation existing, at the time of said contract and sale of said real estate, between the complainant and the guardian, her husband." This finding is unquestionably sustained by the proof. The grantee was bound to know that her husband, the guardian, had no authority, except by order of the probate court, to do otherwise than protect, care for and preserve the estate for the benefit of his ward, until the latter attained majority or he was legally discharged from his office. She was bound to know the fallibility of her title, and that, under the circumstances, it was defeasible on attainment of the ward's majority, at the latter's election, and to know, as above shown, that the

transactions between the guardian and ward, culminating in the making of said deed by the latter to her, were liable to be declared fraudulent and void. She was bound to know that it was the guardian's duty to keep the premises in good repair, and render them available as a means of revenue for the benefit of the ward, and to this end, with the sanction of the court, to use the ward's cash in his hands, within reasonable limits. These principles are familiar. But she was also bound to know that he could not, by virtue of guardianship and without any order from any competent tribunal, erect buildings upon the land or make expensive permanent improvements thereon, and it has been held that where the guardian makes advancement of money for such purpose without any order of court, he is remediless. (Schouler on Domestic Relations, sec. 351; *Hassard* v. *Rowe*, 11 Barb. 22; *Bellinger* v. *Shafer*, 2 Sandf. Ch. 293.) Such; however, has not been, as yet, the holding of this court in such case. But by section 24, chapter 64, of the Revised Statutes, it is provided : "The guardian may, by leave of the county court, mortgage the real estate of the ward for a term of years not exceeding the minority of the ward, or in fee, but the time of the maturity of the indebtedness secured by such mortgage shall not be extended beyond the time of minority of the ward." In passing upon this section, (then section 134 of the Statute of Wills,) this court, in *Merritt* v. *Simpson*, 41 Ill. 391, where the guardian had mortgaged land of his ward in fee, beyond the period of minority, for money which was used in erecting a brick store on the premises, which brought a large rental, held that such mortgage was nugatory and void, so far as the interests of the ward were involved. And it seems to be generally held that the guardian cannot ordinarily execute a mortgage which will be operative as a lien on the ward's land beyond the term of minority, and the ward, on reaching majority, elects to disaffirm it, and that the only safe course for the guardian to pursue is to first

secure the order of court authorizing the mortgage, if there be some statutory provision permitting it. 1 Jones on Mortgages, 102 b; Schouler on Domestic Relations, sec. 352, and cases in notes.

It would therefore necessarily follow, that Mary Ann McParland, not being an innocent purchaser, but having taken her deed with full knowledge of the guardianship and infirmity of her title, was bound to know that the mortgaging of said property for the purpose of making improvements thereon was, as to the interest of the ward, wholly unauthorized and done at her peril. She is entitled to no more protection, in equity, than the guardian himself would be had he taken the deed in his own name instead of his wife's. The legal and logical effects are the same. With such knowledge she can not be permitted to take advantage of that which, in legal contemplation, is her own wrong, to burden the estate of the ward, and no good reason exists why the ward might not, after attaining majority, demand, as in case where the guardian himself has placed unauthorized burdens and improvements upon the estate, to be placed *in statu quo.* (Schouler on Domestic Relations, 348.) But the court may, in the exercise of its equity powers, protect indebtedness incurred for improvements upon the ward's estate, upon the theory that the estate has been benefited and the ward received an advantage thereby. (Id. sec. 351; *Hood* v. *Bridport*, 11 Eng. L. & Eq. 271; *Jackson* v. *Jackson*, 1 Gratt. 143; 1 Atk. 489.) And this the court did, by finding the appellee to be entitled to a one-third interest in the premises, subject to the lien of the trust deeds thereon, which had been given to make said improvements, after the execution of the deed.

As to the improvements made upon the old house during appellee's minority and without any authority from the probate court, appellee electing to repudiate all liability therefor, the court held rightfully, we think, that the interest of the ward should not be encumbered or

chargeable therewith, and that appellant and his wife, having placed such improvements in violation of the trust, were not, in equity, entitled to recompense for the same. The court, however, decreed that appellants should be allowed to remove the old cottage, which had been remodeled and improved, from the premises within four months, and in default thereof that the same should become part thereof. Of this ruling we think appellants have no right to complain. These improvements were placed upon said premises and the interest of appellee wrongfully burdened to pay for the same. Appellants took the risk, and made such improvements with knowledge that they were doing so wrongfully and without the shadow of authority from any competent source.

Numerous objections are made to the master's report and the decree of the court as to various amounts charged to appellant as guardian, etc. An extended review and discussion here of the account as made out by the master, and the items thereof, would be a useless task. The principal objection seems to be that the court erred in charging the defendant James McParland with the rental value of that part of the premises upon which the old house was situated, and occupied by said Mary Ann Mc-Parland and family as a homestead, and the doctrine of compensation between tenants in common is again invoked, and the claim made that for use and occupation of the premises one tenant in common is not liable to account to his co-tenants. As we have just seen, counsel contended that one co-tenant should be recompensed by proper contribution from the others for improvements made upon the estate, and yet the contention is, in effect, made, that though such tenant may have compensation for improvements, he will not be chargeable by his co-tenant with the rents or rental value of the premises occupied by him to the exclusion of the others. The English rule is, that the tenant shall be liable to account to his co-tenants in common only for what he *receives*—

not what he *takes*—more than comes to his just share. In the leading case on this subject—*Henderson* v. *Eason*, 17 Ad. & El. (N. S.) 701,—Lord Cottenham held that he was not liable to account for issues and profits derived by such exclusive occupancy. Such, however, is not the law of this State. By section 1, chapter 2, of the Revised Statutes, it is provided that where a tenant "shall *take* and *use* the profits or benefits" of the estate in greater proportion than his or her interest, such tenant shall account therefor to his co-tenants, etc. And this court in *Woolley* v. *Schrader*, 116 Ill. 29, in passing upon this question and construing the statute, after commenting upon the English case above cited, admitted the doctrine of that case to be the prevailing rule of decision in this country, but said : "Yet by the express terms of our own act the tenant is required to account to his co-tenants for benefits as well as profits, and we fail to perceive any difficulty, in giving effect to this provision of the statute, that may not arise in any case where the value of anything is to be ascertained from opinions of witnesses or extrinsic circumstances,—particularly in a case like the one before us. The farm in question belonged to four children, 'share and share alike.' It would, as shown by the proofs, have readily rented to others at $315 per annum. * * * Appellant, instead of letting the place to others and collecting annually that amount of money as rental, and paying over to his brothers and sisters their respective shares, appropriated the entire use of the farm to himself. To the extent of their interest it was, in effect, appropriating to his own use that amount of money belonging to them, and the question is, shall he account for it ? We have no hesitancy in saying he shall." So here, appellant and his wife, from the date of making his final account as guardian, have been in the exclusive possession and control of said homestead premises as a family home until the death of said Mary Ann McParland and her daughter, Catharine, after which the

husband and father, appellant James McParland, continued in such possession and control, and there can be no question that the court held correctly in charging appellant with what was found to be the reasonable rental value thereof.

It is also insisted that the report of the master and finding of the court as to the value of the premises, of the improvements, rents, etc., were contrary to the clear preponderance of the evidence. After a careful examination of this testimony, and a consideration of the business, experience, character and means of knowledge of witnesses, we are unable to concur with this view. The witnesses produced upon each side were numerous, and very many of them, upon the part of the defendants, were experts,—real estate agents,—some of them knowing nothing personally of the particular location, surroundings and appearance of the premises, and who based their opinions on transfers and sales of property theretofore made along the street or in the neighborhood of the premises in question. Complainant's witnesses were mainly real estate agents having their places of business not far distant from the premises, and owners of property in the neighborhood, whose transactions in the sales and exchange of realty had made them familiar with the market value of land in that vicinity, and, as is not unusual in such cases, there are, in some particulars, considerable contradictory estimates and opinions, but upon the whole we are not prepared to say that the court was not, upon the whole of the evidence, fully warranted in finding as it did. Indeed, as against the testimony of those witnesses produced on behalf of defendants who were merely experts, having no personal knowledge or observation respecting the *locus in quo*, but basing their values solely on the records as to sales made along the street, the court would be amply justified in relying upon the testimony of witnesses for the complainant, who were all, it seems, not without some personal knowl-

edge of the premises and many of them familiar with them for many years,—and this, upon the clearest principles of expediency and sound policy.

,Other objections were made, a discussion of which would not be profitable here. They have all been practically disposed of in what has been said. While the accounting before the master is somewhat complicated, and the findings by him and the court thereon not as clear as might be, yet a careful and studious examination of the record has convinced us that substantial justice has been done ; and while we are not entirely satisfied that the court was warranted in entering the decree against complainant for $95.25, and making the same a charge against the complainant's interest in the premises, yet such error, if error it was, we do not feel justified in estimating of sufficient magnitude, of itself, in a case of this importance, to command a reversal.

The decree of the circuit court will be affirmed.

*Decree affirmed.*