83 247
s186s225

## G. S. Thomas v. Anna V. Whitney et al., Ex'rs.

1. EQUITY JURISDICTION—*Over Persons in Fiduciary Capacities—Fraud.*—In all cases where a confidential relation exists between parties, and the transaction is prejudicial to the interest of the dependent or subordinate one, it will be held to be constructively fraudulent; and in the absence of clear proof that it was the deliberate act of the injured one done upon a full knowledge and understanding. it must be overthrown. Actual and intentional fraud need not be shown in order to overthrow such a transaction.

2. FRAUDS—*Unconscionable Acts by One Occupying a Superior Position, etc.—Measure of Proof.*—It is sufficient to show that the one occupying the superior position of confidence has gained an advantage in the dealing with the one occupying the dependent or subordinate position to throw upon him the burden of proving good faith and absence of influence by himself, and of knowledge, freedom of action and deliberate intention of the other.

Bill to Set Aside Conveyances, etc.—Trial in the Superior Court of Cook County; the Hon. FARLIN Q. BALL, Judge, presiding. Decree for complainant; error by defendant. Heard in the Branch Appellate Court at the October term, 1898. Affirmed. Opinion filed June 9, 1899.

Pinney & Orr, attorneys for plaintiff in error.

John F. Holland, attorney for defendant in error.

Mr. Justice Shepard delivered the opinion of the court.

This is a bill in equity exhibited by R. U. Piper, in his lifetime, now deceased, against the plaintiff in error, for an accounting and to set aside certain conveyances of real estate by Piper to and for the use of plaintiff in error.

Facts about which there can be no material dispute are as follows:

Piper was a physician by profession, and a microscopist and handwriting expert by practice, and had arrived at about seventy-seven years of age, and was possessed of between forty and fifty thousand dollars in real estate, moneys and credits. The real estate was situated in Chicago and Washington, D. C.

In the fall and winter of 1892, he was temporarily residing in Saratoga Springs, New York, in feeble health. His wife died there in the first week of January, 1893, and he was joined there by Thomas, the plaintiff in error, on or about January 15, 1893. Piper had no children, but he had two brothers, one sister and six or eight nephews and nieces.

Thomas also was a physician by profession, but in later years had devoted himself mostly to the real estate business. He appears to have always maintained professional relationship with his brother physicians, and without holding himself out as a practicing physician, to have had occasional patients consult him at his house.

From about 1880 Thomas and Piper were acquaintances, and considerable business and social intimacy existed between them; and from that year to 1895, Thomas was Piper's agent concerning the latter's real estate in Chicago. Upon at least two occasions Piper and his wife visited at Thomas' house—once in 1888 or 1889, for about two weeks, and again in 1891, for about two months—and letters that passed between Mrs. Piper and Thomas and his wife were of a very friendly character.

On January 12, 1893, Piper sent Thomas a peculiar letter from Saratoga Springs, written in what appears to have been a diseased condition of mind, embodying a request to Thomas to come there, and Thomas went at once, arriving there on January 14th or 15th.

Adopting Thomas' testimony, he found Piper without the presence of relatives and in a low condition, and after learning the medical treatment to which he had been subjected, he, Thomas, took charge of the case and changed the treatment radically. Piper improved, and Thomas brought him to Chicago, arriving at Thomas' house about January 28th, where for some weeks, as Thomas testified, Piper's "life hung in the balance; * * * for the first two weeks he was almost perfectly helpless."

From that time forward, until June, 1895, Piper's home was at the house of Thomas, in Chicago, and so far as we can discover from the evidence, he was well nursed, and his wants as well attended to as might reasonably be expected in the house of a private family in comfortable circumstances. During all that time he was a feeble old man and more or less an invalid, and in the early part of the time, at least, he was flighty, and not intellectually clear. Whatever may have been Piper's mental condition after about April, 1893, he seems never again to have become strong enough physically to be trusted alone outside of Thomas' house, and Thomas was his customary attendant when he did go out.

On a few occasions Thomas called in other physicians to see Piper, but the principal nursing and medical attendance given him were rendered by Thomas.

June 25, 1895, Piper left Thomas' house and went to his relatives in Maine, where he died, before the entry of the decree herein in May, 1896. This suit was begun by him in November, 1895, and he testified herein, by deposition, in February, 1896.

Between February, 1893, and November of the same year, while Piper was in the care of Thomas, as has been stated, certain financial and other business transactions

·occurred between them. They are stated by the learned judge of the Superior Court who entered the decree appealed from, in consecutive order, and are adopted by us, as follows:

" At this time Piper had real estate in Chicago and Washington to the value of $34,000, cash over $5,000, and a claim against the Sharon estate for witness fees of $9,000.

On February 20, 1893, Thomas got from Piper an order allowing the former access to the safety deposit box of the latter, in which was $5,000 in cash. Within a month thereafter, Thomas took from such box $3,000 and converted the same to his own use, giving Piper a receipt therefor to the effect that such sum was due him for services and medical attendance from the time he reached Saratoga to April 1, 1893. Both the order and the receipt are in the handwriting of Thomas, the order being signed by Piper.

On March 3, 1893, Thomas drew up a paper authorizing him to collect the $9,000 then due from the Sharon estate to Piper, fixing the fee for such collection at $3,000. This paper Piper signed and handed back to Thomas. The evidence shows that this money was ready to be paid by the estate upon proper vouchers being presented. The matter was arranged by Thomas by letter, and within a month the $9,000 was in Piper's account in Chicago. For some unexplained reason, when Thomas drew a check for the signature of Piper for this fee it was for $2,200, and not for $3,000.

April 10, 1893, Thomas, without legal aid or guidance, drew up in his own handwriting a will for Piper, which was signed and duly attested. By this instrument the wife of Thomas received a bequest of $5,000, his daughter was bequeathed Piper's microscope with the apparatus connected therewith and $1,000 in cash, the sister-in-law of Thomas was bequeathed $300 in money, and the niece of Thomas was bequeathed $500 in money and Piper's typewriting machine, while Thomas was appointed his executor with fees of not less than five per cent upon all amounts by him handled.

October 18, 1893, another will was executed and acknowledged by Piper. The handwriting of this instrument is not identified. The paper written upon is of the identical and peculiar make as is that of the prior will, and the cover of each will is unusual and the same in kind. This last will, after giving to the sister-in-law $100, to the daughter the

microscope, to the niece the typewriting machine, makes Mrs. Thomas residuary legatee.

In each of these wills the brothers and sister of Piper received bequests, but in neither case do they amount to one-third of the estate.

In October, 1893, Thomas went to one of our most experienced and able lawyers, and directed him to draw a deed for the support of Piper during life by Thomas. The result was that October 13, 1893, a deed was signed and acknowledged by Piper, by which he conveyed to Thomas the real estate in Chicago and in Washington, in consideration that Thomas would give him a home as long as he lived; with a proviso that in case Piper at any time desired to leave the Thomas home, he would pay Thomas at the rate of two thousand dollars per year for the time he there remained.

Eight days after the date of this deed Piper gave Thomas a check for two thousand dollars."

The theory upon which the bill was filed to set aside the foregoing transfers of money and real estate, was that they were made by the complainant Piper, when he was upward of seventy-seven years of age, feeble in mind and body from long-continued illness, and broken in spirit by the death of his wife, which had recently occurred, and while he was an invited guest in the house of Thomas, and under his care as physician, and was employing him as a trusted agent; and that such transfers were brought about by the fraud and undue influence of Thomas, and were not the voluntary acts of complainant, and that they were made on grossly inadequate and unconscionable considerations.

The bill offered to pay to Thomas a reasonable sum for his board, care and attendance rendered Piper.

Thomas, by his answer, admitted the receipt of the mentioned moneys, and the execution and delivery of the conveyance of the mentioned real estate.

These several transactions occurred during the first nine months of Piper's residence with Thomas. For substantially all traveling and other expenses, Piper had furnished the necessary additional funds. In considering these matters it should be kept in mind that Piper was not only far advanced in years and feeble in health, but that his previous habits were prudent and economical.

His board and room at Saratoga was at the rate of nine dollars a week, and his physician's bills there were moderate in amount. Nor was his property of such large value as to warrant great prodigality in supplying his personal needs.

The theory of Thomas' defense is that Piper voluntarily, deliberately and with full comprehension of his acts, made these several payments of money and transferred all his real estate.

To make out such a defense, under the existing circumstances, the burden rests heavily upon Thomas to demonstrate the fullest deliberation by Piper and the most abundant good faith by himself. Carter v. Tice, 120 Ill. 277.

To aid his own testimony, Thomas relies upon the testimony of brother physicians, who answer hypothetical questions as to the value of physician's services, and upon writings prepared by himself and signed by Piper. As to such writings, Piper's testimony is in effect a denial of their genuineness, or of his knowledge of what he was doing when he signed them.

According to Thomas' contentions, and his testimony, the $3,000 taken by him from the safety deposit box in March, 1893, was for medical attendance, board and care of Piper for a period of less than eleven weeks, and until April 1, 1893, and a receipted bill to that effect was given by Thomas to Piper. It is at the rate of $40 a day.

The item of $2,200 received by Thomas April 12, 1893, has been sufficiently mentioned in the quoted part of the opinion delivered by the trial judge. The services for which that sum was charged by Thomas appear to have been merely formal.

The $2,000 which Thomas received October 26, 1893, was, as he contends, to pay for the erection of an annex to his residence, built at Piper's request, in order that he might more conveniently continue to make his home with Thomas and enjoy more commodious quarters there.

About a week before the check for this $2,000 was given to Thomas, the deed of the real estate in Washington and Chicago was made by Piper to Moore for the benefit of

Thomas.   The provisions of that deed are sufficiently stated in the quoted opinion by the trial judge, but it may be added that Thomas did not file the deed for record until June 17, 1895, which was a few days before Piper went away from Thomas' house to live with his relatives.

Coming back to the $2,000 item, Thomas testifies that he gave no receipt for it until August 6, 1894; that on that date Piper asked for a receipt for the amount and requested. it to be dated to correspond with the date of the bank check, October 26, 1893; that thereupon he drew a receipt and signed it, and at the same time drew the declaration which bears Piper's signature on the back of the receipt. The receipt and indorsement thereon are as follows:

"$2,000.00.                                CHICAGO, Oct. 26, 1893.
Received of R. U. Piper, two thousand dollars, with which to put an addition to house, No. 2930 Lake Park avenue, which addition is a part of our agreement, not expressed in the deed to George Moore, which at the request of Dr. Piper we kept to ourselves, as we did not consider it necessary to be a part of the same, as said addition is for his use.                                G. S. THOMAS."

"The within spoken (2,000.00) two thousand dollars was not paid to Granville S. Thomas as part payment on board, but as a bonus to get him to accede to the terms made in the agreement, and used to make a good place for me.   The sum is not to be charged to Thomas, but to be considered as a bonus only.                        R. U. PIPER.
CHICAGO, August 6, 1894."

Aside from these two writings and Thomas' testimony, there is no evidence that Piper ever agreed to pay for the annex or any part of it.   He explicitly denies that he ever requested the addition to be built or agreed to pay for it; and he denies all knowledge of any such transaction as the two writings tend to evidence, except that he understood the original check given by him was for a loan to Thomas.

Not only the body of these writings, but all others that are involved in the present record, except the deed of the real estate, are in the handwriting of Thomas.

These two papers were written by Thomas between seven and eight months after the real estate deed had been exe-

cuted by Piper. By the conditions of that deed, the least compensation that Thomas should receive for taking care of Piper was $2,000 a year, or about $40 a week.

If effect is to be given to Piper's declaration upon the back of the receipt, he would pay an additional $2,000 for what the deed had already made magnificent provision.

Thomas had thus received from Piper, within the short space of nine months, in cash, $7,200; he had also received a deed conveying all Piper's real estate, worth over $30,000, which was to become his absolutely at Piper's death, if Piper continued to spend the balance of his lifetime with him, but if not, then to stand as security for his board and care at the rate of $2,000 per year so long as he should live with Thomas.

These various transactions, occurring while Piper was Thomas' patient and an inmate of his house, had taken from Piper about all the property he was owner of less than nine months before, and if he had died before being rescued from Thomas by his relatives, Thomas would have been the possessor of it all. The facts, alone, constitute the severest condemnation of Thomas that can be expressed.

The law also speaks, with no uncertain disapproval, concerning such transactions.

They ought not to be upheld even if Piper had been of sound mind and business capacity when they occurred—which Thomas has far from succeeded in establishing—simply because of the relationship of physician and patient existing between the two.

"It would have been the bounden duty of the defendant to have declined" such extravagant compensation. Popham v. Brooke, 5 Russell (Eng. Ch.), 8.

The more surely the relationship of physician and patient existed, which Thomas contends is the basis of his right to the large charges he has made, the more certainly under the law must his claim meet with defeat. Once establish the existence of the fiduciary relation, and the law immediately steps in and raises a presumption of the invalidity of the transaction which nothing short of clear proof of its fairness can overcome.

The case of Billings v. Southee, 9 Hare (41 Eng. Ch.), 534, was that of a medical attendant who had taken from a prior patient a promissory note for an amount beyond what was due him upon the most extraordinary scale ·of charges.    The vice chancellor there said:

"No part of the jurisdiction of the court (equity) is more useful than that which it exercises in watching and controlling transactions between persons standing in a relation of confidence to each other; and in my opinion this part of the jurisdiction can not be too freely applied, either as to the persons between whom, or the circumstances in which it is applied.

The jurisdiction is founded on the principle of correcting abuses of confidence, and I shall have no hesitation in saying it ought to be applied, whatever may be the nature of the confidence reposed, or the relation of parties between whom it has subsisted.    I take the principle to be one of universal application, and the cases in which the jurisdiction has been exercised—those of trustees and *cestui que trust*—guardian and ward—attorney and client—surgeon and patient—to be merely instances of the application of the principle."

See also Dent v. Bennett, 4 Mylne & Craig (18 Eng. Ch.), 269; Woodbury v. Woodbury, 141 Mass. 329.

In all cases where a confidential relation exists between parties, and the transaction is prejudicial to the interest of the dependent or subordinate one, it will be held to be constructively fraudulent; and in the absence of clear proof that it was the deliberate act of the injured one done upon full knowledge and understanding, it must fall.    Actual and intentional fraud need not be shown in order to overthrow the transaction.

It is sufficient merely to show that the one occupying the superior position of confidence has gained an advantage in the dealing, to throw upon him the burden of proving good faith and absence of influence by himself, and of knowledge, freedom of action and deliberate intention by the other. McParland v. Larkin, 155 Ill. 84.

These several transactions were grossly injurious to Piper, and owing to his old age and feebleness in mind and body, have but very little to sustain them. Thomas has com-

pletely failed to justify their fairness. The burden of doing so was upon him, and they must stand condemned.

The Superior Court, having acquired jurisdiction to set the transactions aside and rehabilitate Piper in his rights, very properly proceeded to do equity to Thomas and allow him all that was justly due him, as the bill offered might be done. The decree was only for the doing by Thomas of what was right after allowing to him everything that in equity and fair dealing he was entitled to, and it is affirmed.